# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**09 CV 3677**

---

**CMEG NYMEX INC.**

                         Plaintiff ,

        -against-

**OPTIONABLE, INC.**, KEVIN CASSIDY,
PIERPONT CAPITAL, INC., EDWARD O'CONNOR,
RIDGECREST CAPITAL, INC.,  and
MARK NORDLICHT,

                         Defendants.

---

**COMPLAINT**

RECEIVED
APR 16 2009
U.S.D.C. S.D.N.Y.
CASHIERS

        Plaintiff CMEG NYMEX Inc, ["CME"], for its complaint against defendants Optionable,

Inc. ["Optionable"], Kevin Cassidy, Pierpont Capital, Inc., Edward O'Connor, Ridgecrest

Capital, Inc. and Mark Nordlicht, alleges (on information and belief as to paragraphs 3 through

9, 16, 20 through 25, 32 through 40, 55, 70 through 74 and 107):

                         **Nature of Action**

        1.      CME, as successor of NYMEX Holdings, Inc. ["NYMEX"], seeks rescission and

restitution and/or damages and other relief as a result of defendants' securities and common law

fraud and breach of warranty in connection with the sales by the defendants to NYMEX in April

2007 of $28.9 million of shares of stock of Optionable and the simultaneous issuance by

Optionable to NYMEX of a warrant for the purchase of additional stock.  Defendants warranted

and misrepresented, in writing, that material statements made and information provided in

documents filed by Optionable (signed by individual defendants) with the Securities and

Exchange Commission ["the SEC"] were truthful, complete and accurate when such was not the

case. Each defendant personally breached his warranties and/or was either a direct primary

wrongdoer or a control person liable for the wrongdoing of the others and/or an aider and abetter of the wrongdoing of his or its co-defendants.

## The Parties and Others Involved

2.     Plaintiff CME is a Delaware corporation which is the successor and successor-in-interest of NYMEX.  Its principal place of business is in Chicago, Illinois.  The Stock and Warrant Purchase Agreement dated as of April 9, 2007 [the "SWPA"] which is at the core of this action provides (in ¶11.7), *inter alia*, that all terms and provisions thereof "inure to the benefit of" NYMEX's successors and assigns, including CME.

3.     Defendant Optionable is a Delaware corporation with its principal place of business in Ossining, New York, in the Southern District of New York. Optionable was formerly engaged in the commodity brokerage business, specializing in serving energy derivatives trading and traders. Optionable's common stock was and is registered with the "SEC" pursuant to §12(g) of the Securities Exchange Act of 1934, and, at all relevant times, traded on the OTC Bulletin Board.  As a public company, Optionable files and, during the period at issue, filed, periodic reports, including (without limitation) Forms 10-K and 10-Q, with the SEC pursuant to §13(a) of the Exchange Act and the Rules of the SEC.

4.     Defendant Kevin P. Cassidy was one of Optionable's founders and served as Vice Chairman of Optionable's board of directors until he resigned on May 12, 2007.  He was also Optionable's Chief Executive Officer during the period at issue; and, regardless of his title, Cassidy lead and was directly involved in Optionable's day-to-day operations during the events at issue. Prior to the sale of Optionable stock to NYMEX in April 2007, Cassidy held, directly and indirectly, more than 3.1 million shares of Optionable stock, equivalent to 5.7% of the

company.  Cassidy is a citizen and resident of Bedford Hills, New York State within the Southern District of New York.

5.      For a time during the relevant period, Cassidy purported to give up some of his formal titles and billed himself as a "consultant" to Optionable in order to avoid disclosing (as required by federal statute and/or rules and regulations of the SEC and/or the Commodity Futures Trading Commission [the "CFTC"]) that Cassidy was a convicted felon who had been incarcerated in jail for fraudulent wrongdoing. Specifically, Cassidy had been convicted of credit card fraud in 1997 and tax evasion in 1993; and been sentenced to jail and other penalties for those crimes. The other defendants and thus Optionable knew of but also concealed Cassidy's criminal fraudulent past.

6.      Defendant Pierpont Capital, Inc. ["Pierpont"] is a New York corporation with its principal place of business at 463 Chappaqua Rd., Briarcliff Manor, New York 10510, within the Southern District of New York.  At all relevant times, Pierpont was under the control of Defendant Cassidy, who was its principal shareholder as well as an officer and director thereof. The Optionable stock sold by Cassidy to NYMEX was held in Pierpont's name at the date of that sale.

7.      Defendant Edward O'Connor was one of Optionable's founders, and from March 2001 to the present has been a director and senior officer of Optionable, including positions as its President and Treasurer. Prior to the sale of Optionable stock to NYMEX in April 2007, O'Connor held more than 3.9 million shares of Optionable stock, equivalent to 7.1% of the company. O'Connor is a citizen and resident of Connecticut.

8.      Defendant Ridgecrest Capital, Inc. ["Ridgecrest"] is a New York corporation with its principal place of business at 61 Hiram Hill Rd., Monroe, Connecticut 06468.  At the time of

3

the relevant actions herein, its principal place of business was at 465 Columbus Avenue, Suite 280, Valhalla, New York 10595, within the Southern District of New York.  At all relevant times, Ridgecrest was under the control of Defendant O'Connor, who was the chief executive officer, director and the sole shareholder thereof.

9.    Defendant Mark Nordlicht was one of Optionable's founders and, from 2000 through May 2007, was Chairman of its Board of Directors. Prior to his sale of stock to NYMEX in April 2007, Nordlicht held more than 15 million shares of Optionable stock, equivalent to approximately 30% of the company.  Nordlicht is a citizen and resident of New Rochelle, New York, within the Southern District of New York.

### Jurisdiction and Venue

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and §27 of the Securities Exchange Act of 1934 (15 U.S.C. §78aa) since this action arises under and involves §§ 10(b) and 20(a) of the Securities Exchange Act (and Rule 10b-5 promulgated thereunder).  This Court has and is also asked to exercise supplemental jurisdiction (if and to the extent it does not already have diversity jurisdiction) over the common law and equitable claims in this action pursuant to 28 U.S.C. §1367, since they are directly related to the claims as to which this Court has federal question jurisdiction.

11.    Venue is proper in this District pursuant to 28 U.S.C. §1391 since some of the defendants reside in the Southern District of New York and/or a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

12.    Each of the defendants is subject to personal jurisdiction in the Southern District of New York since he or it is either a citizen and resident of New York or committed wrongdoing that renders him or it subject to jurisdiction in New York under the Securities Exchange Act or

4

the New York long-arm statute, CPLR §302. The claims herein arose as to each defendant from a transaction of business by that defendant in New York and/or a tortious act (other than defamation) committed by that defendant in New York and/or a tortuous act committed causing injury in New York by that defendant who also satisfies the other jurisdiction prerequisites in CPLR §302(a)(3)(i) and/or (ii) including (without limitation) his or its regularly doing or soliciting business, or engaging in another persistent course of conduct in New York and/or deriving substantial revenues from goods used or consumed or services rendered in New York.

13. Further, the SWPA provides (in ¶11.11) that, *inter alia*, any action "arising out of or in connection with this Agreement or the transactions contemplated hereby may be brought in any federal or state court located in the County and State of New York", and that "each of the parties hereby consents to the jurisdiction of such courts".

### Bases of Allegations
### On Information and Belief

14. The allegations in this Complaint made on information and belief, including (without limitation) those about defendants' fraudulent conduct, are based on defendants' filings at the SEC, as well as recent court actions brought by the United States, the SEC, the CFTC and the Federal Reserve Board against Optionable, Cassidy, O'Connor and others arising out of, *inter alia*, their material misstatements and omissions in their filings at the SEC.

15. Indeed, the United States' indictment of Cassidy and the SEC Complaint against Cassidy and O'Connor expressly allege that they defrauded NYMEX and breached warranties in connection with the purchases of the Optionable stock at issue herein.

5

## Factual Background

**Optionable and Its Business**

16.   Optionable was founded in February 2000 by Defendants Nordlicht, Cassidy and O'Connor to provide, and since then did provide, trading and brokerage services for natural gas and other energy derivatives in the over-the-counter market and on the New York Mercantile Exchange ["the NYMEX Exchange"]. In addition to providing services for the execution of trades, Optionable also provided what it claimed and was supposedly (but not actually) independent, reliable information about market prices and values for various energy derivatives held by its customers.

17.   Optionable was controlled, at all times pertinent hereto, by the other defendants, and acted through the individual defendants as its officers, directors, controlling persons and agents. Thus, the acts and conduct of the individual defendants detailed hereof and complained about herein were the acts of Optionable, as well as of the individual defendants and the other defendant companies which they owned and/or controlled.

18.   In May 2005, Optionable registered a public offering of its stock with the SEC. Since at least the fall of 2005, Optionable filed with the SEC the public reports required of public companies, and Optionable's stock traded on the over-the-counter bulletin board.

19.   Optionable's biggest single customer from 2003 through April 2007 was the Bank of Montreal ["BMO"], whose business accounted for increasingly larger shares of Optionable's revenue.

**The Unlawful Scheme**

20.   Optionable's revenues from BMO were obtained by and as a direct result of an illegal scheme between Optionable and its officers (including without limitation Cassidy and

6

O'Connor) and persons at BMO, particularly a BMO trader named David Lee, to inflate and misrepresent the revenues, value and profitability of Lee's trading activity and mislead other BMO personnel regarding the value of options positions held by BMO, all of which would result in false financial results for Optionable and a misleading impression as to the value of its stock ["the Unlawful Scheme"].

21.    In furtherance of the Unlawful Scheme, starting in 2003 and thereafter through about April 2007, Optionable, Cassidy and O'Connor provided that false and inflated price and market information for its and their own selfish purposes, as well as to help Lee. Twice a month, Optionable, Cassidy and O'Connor provided BMO with purportedly independent price quotes for options and other derivatives held in Lee's trading book at BMO. In truth, those price quotes were nothing more than the prices which Lee had given to Optionable, Cassidy and O'Connor earlier that day, for them to then regurgitate those prices back to other BMO personnel as purportedly independent valuations. ["Optionable's False Price Information"].

22.    Optionable's False Price Information helped Lee create the appearance of profitability, indeed increasing profitability, for his "book" of trades (and thus his own performance-based compensation from BMO), which in turn enabled Lee to continue and increase his trading and business with Optionable, adding millions of dollars of revenue to Optionable for its brokerage and other services to BMO.

23.    Optionable's False Price Information thus created the false appearance of increasing revenues and profits for Optionable which directly affected and inflated Optionable's stock price and apparent value.

24.    The Unlawful Scheme typically operated as follows: after Optionable (usually, Cassidy but also O'Connor) received pricing information from Lee by telephone call or instant

message, Cassidy then reshaped the information to make it look like it reflected genuine offers from independent traders of energy derivatives (when in fact those numbers were simply what he had received from Lee) and then sent it back to others at BMO as supposedly genuine independent market information for those other persons to use in monitoring, authorizing and otherwise overseeing Lee's trading and ability to continue and increase his trading. But, none of the defendants or anyone else at Optionable surveyed the market to develop independent quotes for Lee's positions which Optionable would then provide to BMO.

25.   In 2006, Cassidy also used another Optionable employee, Scott Connor, whose acts were also acts of Optionable, to "u-turn Lee's numbers back to BMO. Cassidy or O'Connor would approve that employee's work; but, again, they made no effort to check the market or provide independent quotes or market prices.

## The Concealment of the Unlawful Scheme and Acts in Furtherance of it

26.   The Unlawful Scheme and the foregoing facts about it and the acts in furtherance of it were concealed by defendants and Optionable; and no facts which would have revealed them were disclosed  in Optionable's filings at the SEC or otherwise to the public (and CME or NYMEX).

27.   The facts became known only in November and December 2008 (only a few months ago) when the CFTC, SEC, United States, Manhattan District Attorney and Federal Reserve Board filed civil actions or criminal proceedings against Optionable, Cassidy, O'Connor and other persons.

## The False Reporting of Optionable's Operations and its Financial Status

28.   In 2006, Optionable publicly reported that it was experiencing a major increase in its revenues and net income. Optionable's annual revenues (supposedly $10.264 million)

8

increased 176.8% over its 2005 revenues and its annual net income (supposedly $6.2 million)
increased 392.7% over its 2005 number.

29.  The principal reason and basis for the supposed increase in Optionable's revenue
and net income was the business it was receiving from and doing with BMO. Revenue from
BMO had almost a quadrupled from just over $1 million in 2005 to over $3.85 million in 2006.
Commission revenue earned for executing BMO trades was frequently supplemented by
commissions paid to Optionable by the counter-parties to those BMO transactions. Thus, the
foregoing numbers only partly show the significance for Optionable's business of the unlawful
BMO relationship and the Unlawful Scheme.

30.  As a result and continuing to conceal Cassidy's criminal fraudulent background,
defendants were able to create the false impression that they were operating a hugely successful
and growing business.

31.  The increases in Optionable's supposed revenues and net income led to a sharp and
significant rise in Optionable's stock price from its approximately $1 initial public price to as
much as $2.84 in the last quarter of 2006 (i.e. an almost tripling).

**The Reality at BMO**

32.  With Optionable's, Cassidy's and O'Connor's active and knowing assistance, Lee
had been able, by virtue of the Unlawful Scheme (and Optionable's False Price Information and
other steps taken in furtherance of it) to create within BMO the false impression that his trading
and book were worth and had generated for BMO hundreds of millions of dollars of profit.

33.  In reality, however, in 2006 Lee (and thus BMO) had already suffered and was
suffering substantial trading losses for BMO, which he was concealing from his superiors at
BMO.

## The Additional Acts in Furtherance of the Unlawful Scheme

34.   In about September 2006, BMO began considering obtaining price information to value its options positions from sources other than only Optionable, including a service which collected and aggregated information from multiple independent sources.

35.   Cassidy and O'Connor (and thus Optionable) realized that such an independent service would uncover Lee's losses and mis-valuation of his positions and that discovery would lead, *inter alia*, to the termination of the revenues Optionable received from BMO. That, they also realized, would cause a significant drop in Optionable's business and its stock price, and thus cause their own apparent wealth (largely the value of their Optionable stock) to disappear.

36.   Thus, in furtherance of the Unlawful Scheme, Optionable (principally through Cassidy) devised and implemented a way to continue to keep accurate market information from BMO and mislead BMO as to the true state of the market and Lee's book.

37.   Specifically, defendants, principally Cassidy and O'Connor (and thus Optionable), proposed and developed a new service to be offered by Optionable called "Opex Analytics" and "RealMarks". The new service would supposedly provide reliable market valuations and prices by showing, in a grid format, specific trading positions of a customer such as BMO in one column and corresponding market quotes from independent reliable sources in other columns.

38.   Optionable publicly but falsely described the new service (including in SEC filings), "as a source of up-to-date, reliable information as to the real-time market valuations of options" and as an "invaluable tool for clients in monitoring their natural gas and energy derivative portfolios."

39.   In truth, the new service was merely a more sophisticated version of the sham pricing and valuation service that Optionable had been providing BMO since 2003. Thus, after

Lee filled out part of the grid with his trading positions, Cassidy and O'Connor then arranged for other parts of the grid (supposedly showing other market prices from independent reliable sources) to be completed with Lee's own pricing information, and then returned to BMO personnel. When asked by BMO personnel about the supposed independence of the new service, Cassidy falsely told BMO that Optionable obtained the quotes in the grid from several different market-makers.

**The Unlawful Inducement of NYMEX to Purchase Optionable Stock from Defendants**

40. As 2006 drew to a close, in order to salvage their apparent wealth and reap a large unjustifiable return on their Optionable stock, Optionable and its principals (including the individual defendants here) determined to find a buyer for a substantial portion of their stock before the Unlawful Scheme became revealed and Optionable lost its lucrative business with Lee and BMO.

41. In late 2006 and early 2007, Cassidy, O'Connor and Nordlicht (for themselves and Optionable) negotiated with NYMEX (in conversations, meetings and other communications in this District in New York) for NYMEX to buy a substantial portion of their own Optionable stock-holdings, obtain a warrant for a further investment in Optionable, and otherwise invest in Optionable.

42. On or about January 15, 2007, in order to enable it to decide whether to buy defendants' stock or otherwise invest in Optionable, NYMEX asked defendants and Optionable to provide it with the information and documents which were "significant with respect to any portion of the business [of Optionable] or which should be considered and reviewed in making disclosures regarding the business and financial condition of [Optionable] to prospective investors."

43.   Defendants referred NYMEX to and supplied NYMEX with Optionable's filings with the SEC and other publicly disclosed information which set forth the false picture of Optionable's business and operations created by the Unlawful Scheme and acts in furtherance of it.

44.   The information provided to and available to NYMEX did not disclose either the Unlawful Scheme or the acts in furtherance of it, including the facts that Optionable's pricing services to its principal customer were a sham, rather than independent (as described in their SEC filings); and that Optionable's revenues and income from that principal customer had been the result of and dependent upon such unlawful conduct.

45.   Relying on the accuracy and completeness of the information about Optionable available to it, particularly that in Optionable's filings with the SEC, NYMEX signed a Term Sheet on January 22, 2007 with Optionable, Cassidy, O'Connor and Nordlicht calling for: NYMEX to purchase 7,000,000, 1,905,000 and 1,853,886 shares of Optionable stock from Nordlicht, O'Connor and Cassidy respectively, at $2.69 per share, which would give NYMEX 19% ownership of the outstanding stock of Optionable. Under the Term Sheet, NYMEX was also to receive a warrant to purchase additional shares of Optionable stock sufficient for NYMEX to own up to 40% of Optionable stock for $3.40 per share after an 18-month delay.

46.   The Term Sheet provided that those purchases by NYMEX were contingent upon and thus subject to certain conditions precedent, including, *inter alia*, NYMEX's completion of its satisfactory due diligence of Optionable; and the execution of definitive agreements containing warranties, representations, covenants and indemnities from Nordlicht, Cassidy, O'Connor and Optionable as to various matters, including *inter alia* the accuracy and completeness of Optionable's filings and the lawfulness of its business.

47.  Thereafter, NYMEX continued its due diligence of Optionable; however, defendants continued to conceal the truth about the Unlawful Scheme and the acts in furtherance of it, as well as how that created a materially false and misleading picture of Optionable's business, status and operations.

48.  On or about April 10, 2007, defendants signed and entered definitive agreements with NYMEX, including (without limitation the SWPA, for the sale to NYMEX of the aforementioned Optionable stock and a warrant to purchase further Optionable stock [the "Warrant"], which closed simultaneously with the execution of the SWPA.

49.  Thus, on April 10, 2007, pursuant to the SWPA, NYMEX paid Nordlicht $18,830,000 for 7,000,000 shares of his Optionable stock, Cassidy and/or Pierpont $5,124,450 for 1,905,000 shares of his Optionable stock, and O'Connor and/or Ridgecrest $4,986,953 for 1,853,886 shares of his Optionable stock.  NYMEX also received the Warrant to buy more stock noted above.

## Defendants Warranties and Representations to NYMEX

50.  In the SWPA, defendants, jointly and separately, warranted and represented to NYMEX [in ¶6.10]:

> SEC Documents.  Since May 2005, the Company [i.e. Optionable] has timely filed all reports, schedules, forms, statements and other documents required to be filed by it with the SEC pursuant to the reporting requirements of the Exchange Act (... the "SEC Documents").  As of their respective dates, the SEC Documents complied with the requirements of the Exchange Act or the Securities Act, as the case may be, and the rules and regulations of the SEC promulgated thereunder applicable to the Company, and none of the SEC Documents, at the time they were filed with the SEC, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. . .

13

and [in ¶6.21]:

> Compliance with Laws.  The business of the Company and its Subsidiaries is not being conducted in violation of any law, ordinance or regulation of any Governmental Entity, including without limitation, the SEC and … except for violations that, either singly or in the aggregate, are not reasonably likely to result in a Material Adverse Change with respect to the Company. … Neither the Company, nor to the Company's Knowledge, any of its officers, directors, employees, affiliates or agents has violated any law, regulation, ordinance, judgment, order or decree which is reasonably likely to give rise to the initiation of an enforcement action by the SEC or NASD.

and [in ¶ 6.29]:

> Disclosure.  No representation or warranty by the Company contained in this Agreement, and no representation, warranty or statement by the Company contained in any certificate or schedule furnished or to be furnished at the Closing to the Purchaser pursuant to this Agreement, contains any untrue statement by the Company of a material fact or omits to state any material fact necessary to make any statement herein or therein not misleading.

In addition, the individual defendants, jointly and separately, further warranted and represented to NYMEX further [in ¶ 7.5]:

> Disclosure.  No representation or warranty by the Founders contained in this Agreement, and no representation, warranty or statement by the Company contained in any certificate or schedule furnished or to be furnished at the Closing to the Purchaser pursuant to this Agreement, contains any untrue statement by the Company of a material fact or omits to state any material fact necessary to make any statement herein or therein not misleading.

51.    The foregoing warranties were breached and these representations were false by reason of the Unlawful Scheme and the other facts detailed herein.

52.    The SWPA provides that those warranties and representations survived the Closing of the transaction [¶11.4] and that all provisions thereof "binding upon and inure to the benefit of and [are] enforceable by" the parties and "their successors and permitted assigns" [¶11.7].

14

**The Unraveling and Disclosure of the Unlawful Scheme**

53.   Unbeknownst to NYMEX, while the parties were finalizing the SWPA and NYMEX's purchases of Optionable stock from them, the Unlawful Scheme began to unravel.

54.   In March 2008, BMO had asked Optionable to provide it with the sources and backup data of the information that Optionable had been supplying to BMO in its grid format since the fall of 2006. Optionable, led by Cassidy and O'Connor and with Nordlicht's knowledge, refused to comply with that request.

55.   Although that was occurring at the very time that NYMEX was about to purchase millions of dollars of Optionable stock from them and despite their warranties and representations to NYMEX and its outstanding request for all material information about Optionable and its business, defendants did not disclose to NYMEX the BMO request and their resistance to it.

56.   Instead, defendants proceeded to close their sale of Optionable stock to NYMEX and its purchase of that stock and acquisition of the Warrant in mid-April 2007 simultaneously with signing the SWPA and related agreement with NYMEX, at the same time breaching the warranties and making the material representations noted above.

57.   On April 27, 2007, less than three weeks later BMO issued a press release announcing that, after reviewing the energy derivatives positions on its books (both then and in prior years), BMO had determined that its positions had been overvalued and misstated and that, accordingly, BMO was recognizing substantial losses on them.

58.   On May 8, 2007, BMO placed Lee and another employee on leave and suspended its business relationship with Optionable. That ended and/or, as a result of further disclosures in May 2007, led to the end of Optionable's business with BMO since the Unlawful Scheme could no longer be implemented.

15

59.   On May 9, 2007, reacting to those developments and revelations, Optionable's stock price fell almost 40% from $4.64 to $2.81 per share; and, on May10, 2007, the stock price fell another 70% to $0.85 per share.

60.   On May 12, 2009, Cassidy resigned or was removed as the chief executive officer and a director of Optionable; and shortly thereafter, his previously concealed criminal record was disclosed in press reports.

61.   Later in May 2007, after further review, BMO announced that the actual losses it had suffered as a result of Lee's trading had totaled C$680 million, due to the mis-marking of the prices for Lee's energy portfolio.

62.   Reacting to the disclosures and the effect they had and would have on Optionable's business, Optionable's stock price dropped below 50 cents by late May 2007.

63.   In its Form 10-Q for the quarterly period ended June 30, 2002, filed with the SEC, Optionable stated [at p. 31] that the "suspension" of BMO's business relationship" with Optionable and "the combined succession of events since then" had "had a significant adverse impact on our business, including current and likely, future results of operations and financial condition."

64.   Since then and as a further direct result of the end of the Unlawful Scheme, Optionable's business has virtually come to a halt. Optionable has had no operating revenues since the third quarter of 2007; and the closing price for its stock on March 26, 2009 was only 1 cent.

65.   In November 2008, after lengthy and extensive non-public investigations, several governmental and regulatory bodies brought charges against Optionable, Cassidy, O'Connor and

others for criminal and civil violations involving and stemming from the Unlawful Scheme and the acts detailed above in furtherance thereof.

a. The United States Attorney for the Southern District of New York indicted Cassidy for various frauds and other crimes, including wire and mail fraud.

b. The SEC charged Cassidy and O'Connor with violations of the Securities Exchange Act by fraudulently misleading NYMEX and Optionable's shareholders by means of, *inter alia*, false reports that they signed and had filed on behalf of Optionable at the SEC.

c. The CFTC charged Optionable, Cassidy and O'Connor with violations of the Commodity Exchange Act by fraudulently and wrongfully mis-marking energy options.

d. The Manhattan District Attorney and the Federal Reserve Board also filed charges against Lee (who had pleaded guilty).

66. As a direct and proximate result of defendants' wrongdoing, NYMEX has suffered substantial injury, including without limitation the loss of virtually its entire $28.9 million investment in Optionable stock and other substantial damages.

<u>First Count</u>
**Sec. Exch. Act § 10(b) and Rule 10b-5**
(against all defendants)

67. Plaintiff repeats and realleges paragraphs 1 through 66.

68. Each and all of the defendants made direct statements and had other direct communications with NYMEX in the negotiations for and regarding the sales to NYMEX of their stock; and they all signed and were parties to the SWPA pursuant to which those sales were made.

69. In the SWPA, Optionable, Cassidy, O'Connor and Nordlicht made the express representations and warranties to NYMEX detailed above.

17

70.   Those representations and warranties were false in at least the following respects:

a.   Optionable's filings with the SEC since May 2005 contained material untrue statements and omitted to state material facts necessary to make the statements made in them not misleading;

b.   Optionable's business had not been conducted and was not being conducted legally, but rather in violation of the federal securities and commodity laws, other federal and state criminal laws, and Rules and Regulations of the SEC and CFTC;

c.   none of the filings disclosed the Unlawful Scheme or the False Prices or other acts of defendants, Optionable and Lee in furtherance of the Unlawful Scheme detailed above;

d.   defendants and their filings with the SEC and CFTC concealed the truth about Cassidy and his criminal fraudulent past;

e.   Optionable's officers, directors, employees and agents had been and were violating, with its knowledge, the federal securities and commodities laws, other federal and state criminal laws, and Rules and Regulations of the SEC and CFTC;

f.   the representations and warranties by Optionable and defendants in the SWPA contained material untrue statements and omitted to state material facts necessary to make the statements made in them not misleading, including those detailed above and below.

71.   Additionally and by way of further example:

a.   Optionable's 2005 and 2006 Forms 10-K (i.e. for the years ended December 31, 2006 and December 31, 2005 respectively) untruthfully and misleadingly stated that the derivatives valuation service provided to BMO and other customers was supposedly independent, honest and reliable, creating the misimpression that that service was and would be a valuable and reliable source and generator of revenue for Optionable. To demonstrate

that system's value to Optionable, Optionable's 2006 Form 10-K first identified a trend in

the energy derivatives industry which was not being met [at p.5]:

> While industry participants have refined their risk management
> processes in the last few years, the vast majority of the holders
> of OTC energy derivatives continue to use theoretical
> approaches to value their portfolio. Without a real-time mark-
> to-market approach, such holders may continue to overstate or
> understate the true value of their energy derivatives portfolio.

It then stressed how its competitors were not providing a solution for that need for real-time

valuation services, explaining that other brokerage firms "do not provide real-time valuation

services to their clients for OTC energy derivatives, which prevents such clients from

determining whether their portfolio is properly valued . . ." [at p.5]. Optionable claimed that,

in contrast, it was providing a reliable independent solution for that problem [at p.6]:

> We also complement our fee-based services with derivatives
> valuation and mark to market services called OPEX Analytics.
> At the request of several of our existing clients, and based on
> our experience and knowledge of the markets as well as wide
> network of counterparties, we can periodically assist our clients
> in valuing their positions in the natural gas derivatives market.

Optionable's 2005 Form 10-K contained a substantially identical discussion. These

statements were false and misleading because, among other things, Optionable was not

assisting the market, or even BMO, to value positions but rather was secretly defrauding

BMO and misleading the market with sham valuation services (including Optionable False

Price Information rather than reliable and independent market information) in order to

further and perpetuate the Unlawful Scheme.

    b. Furthermore, Optionable's 2005 and 2006 Forms 10-K as well as its quarterly

reports for those years (i.e. Forms 10-Q) untruthfully and misleadingly described the

Optionable business relationship with BMO, concealing the fact that the bulk of Optionable's

business came from and was dependent on trading of BMO. The quarterly reports stated (in a footnote to the financial statements) that a single customer, namely BMO, accounted for an increasing amount of Optionable's revenues, in both absolute and relative terms, with the percentage rising from 18% in 2005, to 24% in 2006, to 30% in the first quarter of 2007. But, those reports did not disclose that the commission revenue from that trading came from and depended for continuation on the Unlawful Scheme, and that the bulk of revenue it was receiving from sources other than BMO came from counter-parties to the same trades and trading that BMO was doing and thus would disappear if and when the Unlawful Scheme was exposed.

     c.  Optionable's 2006 Form 10-K stated:

> Mr. Cassidy has served as our Chief Executive Officer since October 2005 and from March 2001 to March 2004. From April 2004 through September 2005, Mr. Cassidy provided consulting services to us ... Mr. Cassidy's primary responsibilities include business development, sales and marketing, and oversight of our brokerage operations.

A similar statement appears in Optionable's 2005 Form 10-K. This statement was materially misleading since it concealed the true nature of Cassidy's functions during April 2004 through September 2005 and the reason for the gap in Cassidy's position as an officer. In truth, Cassidy had continued to perform the functions of the Chief Executive Officer in that interim period but had assumed the "guise" of a consultant in order for Optionable to avoid disclosure of his criminal record. Disclosure of Cassidy's criminal fraud convictions and incarceration would have been required under SEC and/or CFTC Regulations if Cassidy had retained his officership; and Optionable and defendants (who knew of Cassidy's criminal past) filed a false and misleading certification with those regulators concealing Cassidy's true role at Optionable. Disclosure of Cassidy's criminal fraudulent background would have disqualified him for such an executive

position at Optionable and would have led market participants (even BMO) to shun and cease business with Optionable. Moreover, since Cassidy was the principal operating officer and key contact with Lee for implementation of the Unlawful Scheme, that would have prevented the scheme from continuing or succeeding and Optionable from purporting to show the falsified financial results and status which the Unlawful Scheme produced and enabled.

72.    Optionable, Cassidy and O'Connor knowingly or recklessly engaged in the Unlawful Scheme; and they (and therefore their companies Pierpont and Ridgecrest) knew, or were reckless in not knowing, that because of their fraudulent conduct, Optionable's SEC reports (including those described above) were materially false and misleading. They acted with intent to defraud NYMEX and others in making the misstatements and omissions complained of herein, and thus possessed the requisite scienter described above.  They committed the wrongs complained of herein, directly, willfully and wrongfully and for the purpose of encouraging and facilitating their sales of their Optionable stock and, thus, defendants' receipt of substantial monies which they knew would not occur if the truth were known to NYMEX. The wrongful intent of those defendants was also based and is shown by their entry into, furtherance of and purposeful concealment of the Unlawful Scheme and other facts detailed above, including (without limitation) their signing and filing of false and misleading SEC reports which they knew and intended the market and public would rely on as truthful and accurate.

73.    Nordlich's wrongful intent and scienter is based on either his actual knowledge or reckless indifference or failure to learn the true facts.  As Chairman, a founder, a director and a principal of Optionable, Nordlicht had access to all relevant information about its operations, and (if he did not know of it) could have learned of the Unlawful Scheme by mere investigation. Further, Nordlich's company was the counter-party on a substantial number of trades with and

by BMO. Nordlich, like his co-defendants, knew of, but knowingly concealed, Cassidy's criminal fraudulent background, and that the SEC and CFTC had been misled as to it, further revealing his intent to mislead the market and regulators into believing that Optionable was a lawful and legitimate business.

74.    As to NYMEX, defendants purposefully induced and told NYMEX to rely on Optionable's SEC reports in order to induce NYMEX's reliance on them and mislead it to decide to purchase Optionable stock. Defendants knew or recklessly failed to know that those reports contained and created a false and misleading presentation of Optionable's business, operations, financial results and prospects. Defendants knew and intended that NYMEX would be led by those reports into believing that Optionable was an honest and law-abiding business, run by legitimate businessmen, and with a sound historical record, which was worthy of NYMEX's investment; whereas, the opposite was true. Defendants did so in order to reap a huge financial gain by selling significant portions of their Optionable stock to NYMEX before the Unlawful Scheme unraveled, which defendants each did.

75.    The foregoing misstatements and omissions were material.  A reasonably prudent investor would have wanted to know the truth and the omitted facts in deciding whether to purchase the bonds.  Among other things, a purchaser of Optionable stock would have wanted to know that the valuation services provided to BMO, its increasingly principal customer, were real rather than a "sham" designed to perpetuate Optionable's revenue stream.

76.    NYMEX did not know of the untruth of the aforesaid misstatements and omissions; rather, NYMEX relied upon the information provided to it as true and complete, and in such reliance, purchased the securities.

77.   NYMEX's reliance was justifiable. NYMEX was entitled to believe that reports filed with the SEC by a public company were and would be truthful and accurate. NYMEX, as a public and regulated company, understood that making falsehoods in such reports might be criminal and could lead to significant criminal and civil liability and penalties; and it had no reason to know about the Unlawful Scheme or evidence revealing it or any material untruth or omission in Optionable's SEC filings. Indeed, defendants had carefully and successfully concealed the Unlawful Scheme for over three years, and were continuing to do so. NYMEX also retained and was represented by able counsel at Skadden Arps, who found no evidence of falsehood in those SEC reports.

78.   If NYMEX had known the truth and the complete facts, NYMEX would not have purchased Optionable stock from defendants or otherwise; and its decision to do so was the direct and proximate result of defendants' wrongdoing and NYMEX's aforesaid lack of knowledge and justifiable reliance.

79.   As a direct and proximate result of the wrongful conduct detailed above and the wrongdoing complained of herein, defendants' Optionable stock was not worth what NYMEX was being induced to pay for it. Thus, defendants' conduct detailed herein and complained above caused and had a proximate causal connection with the injury complained of herein; and it was a substantial factor in bringing about and causing that injury. That injury was also a direct and reasonable foreseeable consequence of defendants' wrongdoing. Defendants knew, while negotiating to sell NYMEX their Optionable stock, that their SEC reports and statements would mislead and were misleading the public and the marketplace as to the value of Optionable stock, and would mislead and were misleading NYMEX as to the value of the stock it was purchasing and the viability of Optionable as a business and investment opportunity.

23

80.   The transactions at issue (i.e., defendants' sales to NYMEX of Optionable stock) were effected, including the negotiation and consummation thereof, by the use of means and instruments of transportation and communication in and of interstate commerce (including, without limitation, the use of interstate telephone) and the mails in and from the State of New York. These included mailings, interstate phone calls, faxes and internet transmittal of information to NYMEX, and other uses of the facilities of interstate commerce.

81.   By reason of the foregoing, in contravention of §10(b) of the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder (particularly Rule 10b-5), defendants sold to NYMEX, and it purchased, securities by use of means and instruments of transportation or communication or interstate commerce or by use of the mails and, in connection therewith, defendants directly or indirectly (a) employed a device, scheme or artifice to defraud NYMEX, (b) obtained money or property from NYMEX by means of an untrue statement of material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading, and (c) engaged in a transaction, practice or course of business which operated as a fraud and deceit upon NYMEX.

82.   By reason of the foregoing, defendants are liable, jointly and severally, to plaintiff for violation of the federal securities law, including §10(b) of the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder (particularly Rule 10b-5).

83.   Plaintiff, as successor to NYMEX, thereby tenders the stock and warrant which NYMEX purchased and obtained from defendants, and demands that the sales to NYMEX and its purchases of that stock be rescinded, and that defendants make full restitution of, and repay to plaintiff, all consideration paid or given by NYMEX therefor, plus interest.

24

**Second Count**
**Section 20(a) of Securities Exchange Act**
(against defendants Nordlicht, Cassidy and O'Connor)

84. Plaintiff repeats and realleges paragraphs 1 through 66 and 68 through 83 above.

85. Prior to and at the time of their sales to NYMEX of the Optionable stock at issue and its purchases of those securities, each of Nordlicht, Cassidy and O'Connor was a director, major shareholder, founder and/or senior executive and operating officer of Optionable.

86. Cassidy and O'Connor had day-to-day operating roles and duties at and for Optionable, and thus controlling person responsibility as to the wrongdoers and the matters at issue here.

87. Nordlicht had direct oversight responsibility (i.e. to oversee Optionable's business and operations) as a director and as Chairman of Optionable's Board of Directors, and thus controlling person responsibility as to the wrongdoing and the matters at issue here.

88. Cassidy was and is also a director, officer and principal shareholder of Pierpont and a controlling person of Pierpont; and it acted and acts only through and at the direction and under the control of Cassidy. Thus, Cassidy has controlling person responsibility for Pierpont for and as to the wrongdoers and the matters at issue here.

89. O'Connor was and is also a director, officer and the sole or principal shareholder of Ridgecrest, and a controlling person of Ridgecrest; and it acted and acts only through and at the direction and under the control of O'Connor. Thus, O'Connor has controlling person responsibility for Ridgecrest for and as to the wrongdoing and the matters at issue here.

90. Optionable made the same warranties and representations to NYMEX in the SWPA (detailed above) as those defendants made.

91.    Optionable acted, in connection with the sales of stock to NYMEX and its purchases of stock at issue, through defendants as its officers and directors, and its conduct was committed and undertaken by them on its behalf as controlling persons of Optionable.

92.    Optionable therefore committed the same federal securities and other fraud that defendants committed detailed herein; and it participated in and aided and abetted the wrongdoing of defendants which is complained of herein.

93.    Defendants exercised and used their control by directing, supervising and/or taking a direct role in Optionable's day-to-day operations, especially with respect to the BMO relationship, and by personally reviewing and signing Optionable's false and misleading SEC reports and other misstatements to the SEC and the CFTC.

94.    Defendants also dealt directly with NYMEX on behalf of Optionable and each other in causing, enabling and participating in the transactions by which defendants sold their Optionable stock to NYMEX and it purchased that stock.

95.    During the time at issue, defendants possessed the power to influence and control Optionable's activities and they were exercising that power by their aforesaid conduct.

96.    By reason of the foregoing, defendants are liable, jointly and severally, to plaintiff, as controlling persons, pursuant to §20(b) of the Securities Exchange Act of 1934, for any wrongdoing of Optionable and their co-defendants, including the wrongs complained of herein.

### Third Count
### breach of contract and warranty
(against all defendants)

97.    Plaintiff repeats and realleges paragraphs 1 through 66, 68 through 80, 83, and 85 through 95 above.

98.    Defendants each made the warranties detailed above in the SWPA.

99.   Those warranties were contractual undertakings by each of the defendants, jointly and separately.

100.   Those warranties were breached as detailed above.

101.   Plaintiff justifiably relied (as defendants knew, induced and intended) on those warranties in deciding to purchase Optionable stock and obtain the Warrant from defendants.

102.   By reason of the foregoing, defendants are liable, jointly and severally, to plaintiff for breach of contract and breach of warranty.

<u>Fourth Count</u>
<u>common law fraud</u>
(against defendants Cassidy and O'Connor)

103.   Plaintiff repeats and realleges paragraphs 1 through 66, 68 through 80, 83, 85 through 95, and 98 through 101 above.

104.   Defendants' conduct complained of herein constitutes common law fraud.

105.   By reason of the foregoing, defendants are liable, jointly and severally, to plaintiff for common law fraud.

<u>Fifth Count</u>
<u>aiding & abetting common law fraud</u>
(against all defendants)

106.   Plaintiff repeats and realleges paragraphs 1 through 66, 68 through 80, 83 through 95, 98 through 101, and 104 above.

107.   Defendants each knew of the fraud against NYMEX committed by their co-defendants as detailed above; and they each substantially caused, participated in and assisted that fraud with knowledge of that fraud and with intent to deceive NYMEX and assist the fraud, so that he or it would benefit, at NYMEX's expense from that fraud, as actually happened.

27

108. By reason of the foregoing, defendants are liable, jointly and severally, to plaintiff for aiding and abetting common law fraud.

### Sixth Count
**negligent misrepresentation**
(against all defendants)

109. Plaintiff repeats and realleges paragraphs paragraphs 1 through 66, 68 through 71, 74 through 80, 85 through 93, and 98 through 101 above.

110. Defendants each had and has a contractual relationship, including the SWPA, with NYMEX in connection with their sales of Optionable stock to NYMEX and its purchases of that stock and obtaining of the Warrant from them; thus, there was a special relationship between each of them and NYMEX.

111. Accordingly, each defendant had a duty to assure that the material statements made to NYMEX in connection with the transactions at issue were truthful, and were accurate and complete.

112. The material statements made to NYMEX in connection with the transactions at issue were materially untruthful, inaccurate and incomplete.

113. Defendants knew or should have known that the statements in Optionable's SEC reports were materially untruthful, inaccurate and incomplete.

114. Defendants allowed and caused Optionable's SEC reports containing untruthful, inaccurate and incomplete material statements to be given to NYMEX in connection with the transactions at issue for it to rely upon in deciding whether to purchase Optionable's stock from defendants.

115.  Defendants knew that NYMEX was reviewing Optionable's SEC reports and relying on them in deciding whether to purchase Optionable's stock and obtain the Warrant from defendants.

116.  NYMEX believed that Optionable's SEC reports were truthful, accurate and complete, and reasonably relied on them in that belief.

117.  Defendants' allowing that to occur and their failure to assure that the material statements in Optionable's SEC reports given to NYMEX were truthful, accurate and complete were, at a minimum, negligent.

118.  As a result of the foregoing, defendants are liable, jointly and severally, to plaintiff for negligent misrepresentation.

119.  By reason of the conduct complained of herein, each defendant is liable, jointly and severally to plaintiff for its full damages in an amount in excess of $28.5 million to be determined at trial, plus interest

**Seventh Count**
**damages alternative to Counts One through Five**
(against all defendants)

120.  Plaintiff repeats and realleges paragraphs 1 through 82, and 84 through 108 above.

121.  This claim seeking damages is asserted as an alternative to plaintiff's claims for rescission and related relief in Counts One through Five of this Complaint.

122.  Plaintiff has been substantialy damaged, as detailed above, by defendants' wrongful conduct alleged herein.

123.  By reason of the conduct complained of herein, each defendant is liable, jointly and severally to plaintiff for its full damages in an amount in excess of $28.5 million to be determined at trial, plus interest, for one or all of the legal grounds asserted herein, including: (a)

securities fraud; (b) controlling person liability for securities fraud; (c) breach of contract and warranty; (d) common law fraud; and/or (e) aiding and abetting common law fraud.

124.   Defendants' conduct complained of herein was so wantonly willful, intentional, unlawful, egregious, reckless and/or otherwise excessively improper, and was committed with such wanton disregard of the public and the safety and well-being of the public (as well as NYMEX's and plaintiff's rights and well-being) and outside the bounds of acceptable conduct.

125.   As a result, plaintiff is entitled to and should be awarded punitive damages as against defendants, jointly and severally, in the amount of $28.5 million.

WHEREFORE, plaintiff requests judgment against defendants, jointly and severally, as follows:

a.   rescinding the sales by defendants to NYMEX of Optionable stock and issuance to it of the Warrant, and requiring defendants to return to NYMEX all money and consideration paid for that stock, with interest;

b.   alternatively, awarding plaintiff the full damages it has suffered in an amount in excess of $28.5 million to be determined at trial, with interest;

c.   awarding plaintiff the costs and expenses of this action; and

d.   granting plaintiff such other and further relief as the Court may deem just and proper.

Dated:   April 10, 2009
         New York, New York

POLLACK & KAMINSKY

by: _Martin I. Kaminsky_

Martin I. Kaminsky  (MK 3033)
mikaminsky@pollacklawfirm.com
Edward T. McDermott (EM 7243
etmcdermott@pollacklawfirm.com
114 West 47th Street
New York, New York 10036
Tel. (212) 575-4700
Fax (212) 575-6560

*Attorneys for Plaintiff*
CMEG NYMEX Inc.

31