# EXHIBIT B

 **'08 CIV 9961·**

DAVID ROSENFELD
Associate Regional Director
New York Regional Office
SECURITIES AND EXCHANGE COMMISSION
3 World Financial Center, Suite 400
New York, New York 10281
(212) 336-0153
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
.. V 1 9 2009
U.S.D.C. S.D. N.Y.
CASHIERS

SECURITIES AND EXCHANGE COMMISSION,

                        Plaintiff,

            -against-                                : Civil Action No.

DAVID LEE, KEVIN P. CASSIDY, EDWARD          :
O'CONNOR, and SCOTT CONNOR,                   : COMPLAINT
                                              :
                                              :
                        Defendants.           :

Plaintiff Securities and Exchange Commission ("Commission"), for its complaint against

defendants David Lee ("Lee"), Kevin P. Cassidy ("Cassidy"), Edward O'Connor ("O'Connor"),

and Scott Connor ("Connor") (collectively "Defendants"), alleges as follows:

## SUMMARY OF ALLEGATIONS

1.      This case involves a fraudulent scheme to overvalue a commodity derivatives

trading portfolio at Bank of Montreal ("BMO"), resulting in a restatement of BMO's publicly

reported financial results.  In May 2007, BMO reduced its net income for the first quarter of its

fiscal year ended October 31, 2007 ("FY 2007") by approximately 237 million Canadian dollars

("CAD") -- which reflects a 68% overstatement of BMO's net income for that quarter -- after

learning that Lee, one of its senior commodity traders, had engaged in a long-running scheme to overvalue BMO's portfolio of natural gas options by deliberately "mismarking" trading positions for which market prices were unavailable.  Lee overvalued the positions on BMO's books by regularly recording inflated values that were then purportedly validated by Optionable, Inc. ("Optionable"), a publicly traded commodities brokerage firm where Cassidy, O'Connor and Connor worked.  Optionable held itself out to BMO and the public as a provider of independent derivatives valuation services, but that was false, as Cassidy, O'Connor and Connor schemed with Lee to have Optionable simply rubber-stamp whatever inflated values Lee recorded.  BMO was Optionable's largest customer, and BMO trades accounted for as much as 60% of Optionable's commodity brokerage business.  Lee's trading accounted for virtually all of BMO's business with Optionable.  As a result, Optionable's management, led by Cassidy, was willing to do whatever it took to keep Lee happy.

2.     When market prices were unavailable, BMO's risk management personnel sought to verify the accuracy of BMO's commodity derivatives traders' valuations of their positions, or their "marks," by obtaining supposedly independent valuations, or "quotes," for those positions from one or more third parties.  During the relevant period, Optionable was the primary source of the third-party quotes that BMO used to validate Lee's marks.  Lee provided his marks to Cassidy, O'Connor or Connor, who then simply forwarded Lee's marks, virtually unchanged, to BMO's risk management department as if they were Optionable's independent quotes.  At first, Lee used this "u-turn" scheme to boost his trading profits and incentive compensation, but in 2006, the market turned against Lee and he used the scheme to hide substantial trading losses.  In May 2007, BMO concluded that due to the Optionable scheme and other positions that Lee had also mismarked, Lee's trading book was overvalued by an aggregate total of $680 million (CAD)

2

since the beginning of BMO's fiscal year ended October 31, 2006 ("FY 2006"). For the third quarter of BMO's fiscal year 2007, it reported a further $149 million in losses from unwinding Lee's overvalued position.

3.      Cassidy and O'Connor also defrauded Optionable's public shareholders by concealing Optionable's role in the scheme. Optionable's periodic reports touted the synergistic benefits of the derivatives valuation services that Optionable purportedly provided to multiple brokerage clients, but those reports, which Cassidy and O'Connor signed, never disclosed that BMO was the principal client for whom those "services" were performed and that the "valuation services" provided to BMO were a sham designed to defraud BMO.

4.      In addition, Cassidy and O'Connor defrauded the New York Mercantile Exchange ("NYMEX") by selling over $10 million of their own Optionable stock to NYMEX in April 2007. Both Cassidy and O'Connor misrepresented to NYMEX that Optionable's periodic reports were materially accurate, and neither of them disclosed anything about their scheme with Lee to defraud the shareholders of BMO, Optionable's largest customer. On May 9, 2007, one day after BMO announced that it had placed Lee and Lee's supervisor on leave and suspended its business relationship with Optionable, Optionable issued an announcement stating that the suspension would have an adverse effect on Optionable's business. Optionable's stock price fell almost 40% that day, from $4.64 to $2.81 per share, and dropped to below 50 cents per share one week later after Cassidy's prior criminal record was disclosed in press reports.

5.      By virtue of the foregoing conduct, each of the Defendants, directly or indirectly, singly or in concert, violated and are otherwise liable for violations of the federal securities laws, as follows:

3

(a)     Lee violated Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5 and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1]; and he is also liable, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting (i) violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by BMO and the other Defendants, and (ii) BMO's violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-20, 13a-1 and 13a-16 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-16];

(b)     Cassidy and O'Connor each violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13a-14, 13b2-1 and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1 and 240.13b2-2]; and each of them is also liable, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting (i) violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] by BMO, Optionable and the other Defendants, (ii) Optionable's violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13], and (iii) BMO's violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A)] and Rules 12b-20, 13a-1 and 13a-16 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-16];

(c)     Connor violated Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5 and 13b2-1 thereunder [17 C.F.R. §§ 240.10b-5,

240.13b2-1]; and he is also liable, pursuant to Section 20(e) of the Exchange Act [15 U.S.C.

§ 78t(e)], for aiding and abetting (i) violations of Section 10(b) of the Exchange Act [15 U.S.C.

§ 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] by BMO, Optionable and the other

Defendants, (ii) Optionable's violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the

Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1

and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13], and (iii) BMO's violations of

Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A)] and

Rules 12b-20, 13a-1 and 13a-16 [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-16].

     6.    Unless the Defendants are permanently restrained and enjoined, they will again

engage in the acts, practices, transactions and courses of business set forth in this complaint and

in acts, practices, transactions and courses of business of similar type and object.

## JURISDICTION AND VENUE

     7.    The Commission brings this action pursuant to authority conferred by Section

20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Exchange Act

[15 U.S.C. § 78u(d)(1)], and seeks to restrain and enjoin each of the Defendants from engaging

in the acts, practices, transactions and courses of business alleged herein.  The Commission also

seeks a final judgment:  (a) ordering each of the Defendants to disgorge the ill-gotten gains

received as a result of the violations for which they are liable and pay prejudgment interest on

those amounts; (b) ordering each of the Defendants to pay civil monetary penalties pursuant to

Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and, as to Cassidy and O'Connor,

also pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)]; and (c) prohibiting

Cassidy and O'Connor from acting as an officer or director of a public company pursuant to

Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)].

8.      This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(d) and 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].  Many of the acts, practices, transactions and courses of business alleged herein occurred within the Southern District of New York.  For example, Lee worked at BMO's Manhattan office and engaged in many of the acts referred to herein from there, and Optionable's principal place of business is located in the Southern District of New York.

9.      The Defendants, directly and indirectly, have made use of the means or instrumentalities of, or the means or instruments of transportation or communication in, interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the transactions, acts, practices and courses of business alleged herein.

## THE DEFENDANTS

10.     **Lee,** age 36, was a natural gas options trader employed by BMO Capital Markets Corp., a wholly-owned subsidiary of BMO and a registered broker-dealer, until he resigned on May 15, 2007.  From 2001 through 2004, Lee was a Vice President of BMO's Commodity Derivatives Group, the unit through which BMO traded commodity derivatives.  In 2005, he was promoted to Managing Director of that group, which BMO renamed the Commodity Products Group ("CPG").  Lee resides in New Jersey and worked at BMO's office located in New York, New York during the relevant period.

11.     **Cassidy,** age 49, was one of Optionable's founders and served as Vice Chairman of Optionable's board of directors until he resigned on May 12, 2007.  Except for the period

from March 2004 to October 2005, he was also Optionable's CEO throughout the relevant period. Prior to selling a block of shares to NYMEX in April 2007, Cassidy held more than 3.1 million shares of Optionable stock, equivalent to 5.7% of the company. Cassidy resides in Bedford Hills, New York.

12.    **O'Connor**, age 55, was one of Optionable's founders and since 2001, he has served as President and a director of Optionable. From March 2004 through October 2005, he was also Optionable's CEO and Treasurer. Prior to selling a block of shares to NYMEX in April 2007, O'Connor held more than 3.9 million shares of Optionable stock, equivalent to 7.1% of the company. O'Connor resides in Briarcliff Manor, New York.

13.    **Connor**, age 31, was employed by Optionable as a commodities broker until his resignation in May 2007. Connor resides in Rye, New York.

<u>**RELEVANT ENTITIES**</u>

14.    **BMO** is a Canadian banking company with its principal place of business in Toronto, Canada and with other offices located in the United States, including in New York, New York. BMO's common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the New York Stock Exchange and Toronto Stock Exchange. BMO files periodic reports, including Forms 40-F and 6-K, with the Commission pursuant to Section 13(a) of the Exchange Act and related rules as a foreign private issuer.

15.    **Optionable** is a Delaware corporation engaged in the commodity brokerage business, with its principal place of business in Valhalla, New York. Optionable's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and trades on the OTC Bulletin Board. Optionable files periodic reports, including Forms 10-KSB

and 10-QSB, with the Commission pursuant to Section 13(a) of the Exchange Act and related rules.

## BACKGROUND

### Lee's Trading And Compensation

16.     Since the 1990s, BMO has traded commodity derivatives through its CPG unit, on behalf of customers and for its own proprietary account.  In 1998, the CPG trader responsible for trading natural gas options was fired by BMO for mismarking his book.  Lee eventually took his place and traded natural gas options at the CPG until he resigned in May 2007.

17.     At first, Lee traded primarily for customer accounts, but his proprietary trading grew dramatically over the years.  Enhanced by the fraud, Lee's book was highly profitable and became by far the largest book in the CPG, one of ten trading units at BMO.  As a result of Lee's trading and inflated marks, the CPG was a large and steadily increasing contributor to BMO's trading profits until mid-2006.  In the latter part of 2006 and early 2007, Lee's book experienced and reported significant trading losses.  Due to the fraud, the actual losses were even greater than was initially reported.

18.     Lee's compensation increased along with his trading profits.  In 2003, he received a total bonus worth $650,000, consisting of $550,000 in cash and $100,000 in accrued long term incentive compensation.  Lee received a similar package in 2004.  In 2005, however, his total bonus package grew to $3.05 million, of which $2.05 million was paid in cash.  In 2006, Lee received a total of $5.35 million, of which $3.6 million was paid in cash.

19.     Over the years, Lee used different brokers to execute his trades, but by 2006, Optionable was Lee's primary broker and received one-third to one-half of the total monthly

commissions generated by Lee's trading.  By its own account, Optionable derived 24% of its

total brokerage revenues in 2006 from BMO for Lee's trading.

**The Valuation Of Natural Gas Options At BMO**

20.    At BMO, each commodity derivatives trader is responsible for marking his or her

book daily, *i.e.* assigning a value to each position in the book.  If the derivatives are regularly

traded on a recognized market, the valuation is done on a mark-to-market basis.  The situation is

different, however, for certain other derivatives, including options that are "out-of-the-money,"

*i.e.* call options with a strike price above the underlying instrument's market price or put options

with a strike price below the underlying instrument's market price.  Such options are often not

traded on an exchange, and options that are far from the market price, known as "deep out-of-

the-money options," are thinly traded even over-the-counter, if at all.

21.    At BMO, options for which there was no readily ascertainable and reliable market

price were marked using a computerized pricing model, *i.e.* mark-to-model valuation.  Traders

were responsible for the data inputs made to the model.  Some inputs are fixed, such as the

option's expiration date, while others are variable and must be calculated by the traders.  To

protect against errors or deliberate mismarking by traders when using mark-to-model valuation,

BMO's market risk unit ("Market Risk") supervised an internal control system that was intended

to obtain independent price verification.  If the independently obtained price was lower than the

trader's valuation, a reserve was recorded to account for the difference.  For each option product

for which reliable exchange prices were unavailable, Market Risk personnel were required to

select third parties to serve as a source for independent quotes.  However, BMO primarily used

Optionable to verify Lee's marks since at least as far back as 2003, as the CPG unit successfully

resisted efforts by Market Risk to transition to available multi-contributor independent valuation

services until shortly before the fraud unraveled. A multi-contributor independent valuation

service was available since 1997 and a second became available in 2004, but BMO did not even

subscribe to, let alone rely upon, such a service until the latter part of 2006.

### THE DEFENDANTS' FRAUDULENT SCHEME

**Overview**

22.      Lee schemed with the other Defendants to deliberately mismark, and overvalue,

his trading book from as far back as 2003 until April 2007. Pursuant to the Defendants' scheme:

(i) Lee purposely made advantageous variable data inputs into the pricing model that inflated the

recorded value of the out-of-the money options that he traded, which at times accounted for as

much as approximately 95% of his book; and (ii) Cassidy, O'Connor and Connor then provided

purportedly independent quotes to BMO that were literally nothing more than Lee's own prices.

Through their fraud, the Defendants systematically undermined the accuracy and integrity of

BMO's financial reporting function over multiple reporting periods. Lee initially employed the

scheme to "smooth" the appearance of his book's day-to-day performance by inflating his marks

when his book had performed poorly. Lee thereby minimized the apparent risks associated with

his positions, which led BMO to approve Lee's requests for higher trading limits and the

elimination altogether of limits on the size of any particular position held by Lee. As a result of

these initial stages of the fraud, the size of Lee's book expanded and the scale of the fraud

progressively increased.

23.      In FY 2006 and the first quarter of FY 2007, the Defendants' fraud resulted in a

material overstatement of the net income and other financial results that BMO reported to the

public. According to the restatement announced by BMO in May 2007, BMO overstated net

income by a total of $237 million (CAD), or 68%, and revenue by a total of $509 million (CAD)

in the first quarter of FY 2007.  Of those amounts, the Defendants' scheme accounted for $91 million (CAD) in overstated net income, or 26% of BMO's actual net income, and $197 million (CAD) in overstated revenue.  The balance of the restatement resulted from the overvaluation of certain so-called "straddle" positions in Lee's book, described below in paragraph 36.  In FY 2006, BMO's annual pre-tax income was overstated by a total of 6.2%, and by 5.5% due to the Defendants' fraud.  Over the six quarters from November 1, 2005 through April 30, 2007, Lee overvalued his book by a total of $680 million (CAD), of which $432 million (CAD) or 9.3% of aggregate pre-tax income and 6.8% of aggregate post-tax net income, is attributable to the Defendants' fraud.  The fraud unraveled at the end of the second quarter of FY 2007 and BMO was able to correct the $235 million (CAD) in overstated revenue and $124 million (CAD) in overstated net income attributable to the Defendants' fraud -- a 22.2% impact on income before taxes -- which it initially recorded that quarter before releasing those results to the public.

**The Mechanics Of The Mismarking Scheme**

24.     Cassidy, O'Connor and Connor colluded with Lee to inflate the value of Lee's trading positions for over four years.  Beginning as early as 2003, Optionable supplied BMO's back office with twice-monthly quotes for use in BMO's price verification process that consisted of nothing more than Lee's own prices.  After receiving from BMO's back office the list of quotes it was seeking to verify, Lee would email to Optionable a list of his values for those positions.  Later that same day, Optionable would email a list containing the same (*i.e.* Lee's own) values to BMO's back office, as well as to Lee.

25.     Lee and Cassidy developed this fraudulent practice of "u-turning" Lee's own marks back to BMO, and Cassidy directed the process at Optionable's end.  Cassidy and Lee determined how to successfully "u-turn" the quotes without detection by BMO, and Cassidy

selected and instructed the brokers at Optionable to whom he assigned the task of receiving

Lee's quotes and forwarding them virtually untouched to BMO. In addition, at various times

Lee sent pricing information for his positions to Cassidy by telephone calls and instant messages,

and then Cassidy returned this information virtually unchanged to Lee by instant messages,

knowing that Lee would submit the instant messages to Market Risk. Cassidy prepared the

instant messages that he sent to Lee in a way that made them appear to reflect genuine offers to

trade from independent natural gas options traders when, in fact, Cassidy's instant messages

merely regurgitated Lee's own pricing information.

26.    O'Connor handled the mechanics of the "u-turn" process for a period of time in

2005, and Connor took over that role later in 2005 and performed it, under Cassidy's direction,

until the latter part of 2006. Cassidy informed Connor that Lee would periodically email his

prices to Connor, and Cassidy instructed Connor to forward Lee's prices unchanged to BMO as

Optionable's own quotes. O'Connor gave Connor the names of the BMO personnel to whom

Connor should send the quotes. When Connor asked questions about the nature of Lee's prices

or the process, Cassidy admonished him to, in effect, just shut up and do it. Connor complied.

27.    Connor initially retyped Lee's marks but occasionally made typographical errors.

After Lee complained to Cassidy, Connor started running his retyped document by Lee for Lee's

approval before sending the document on to BMO in order to ensure that Lee was satisfied with

the numbers. In some cases, Cassidy or O'Connor would also review and approve Connor's

work. The numbers on the document retyped by Connor almost always matched those on Lee's

initial email to Connor, as neither Connor nor anyone else at Optionable ever surveyed the

market to develop independent quotes for Lee's positions.

28.     Cassidy personally implemented the process of "u-turning" Lee's marks in the latter stages of the fraud. In 2005 and 2006, BMO's Market Risk personnel became increasingly concerned about the size and risk of the positions in Lee's book and imposed additional controls designed to increase the verification of Lee's marks. However, Lee and Cassidy adapted the "u-turn" scheme to the new controls and continued the fraud until April 2007.

29.     In 2005, Market Risk pushed for BMO to use a valuation service called Totem, a well established independent multi-contributor valuation service. After a long debate between Market Risk and the CPG leadership, which opposed the use of Totem, BMO finally subscribed to Totem in the late summer of 2006. Totem's initial valuation of Lee's book was more than $100 million below the values assigned by Lee and supposedly "verified" by Optionable. BMO decided temporarily to revise its valuation of Lee's book by essentially averaging the reserves indicated by the Totem and Optionable values. The result was a mere $13 million increase in the reserve for FY 2006, resulting in a $22 million reserve at year end and a similar increase to the reserve at the end of the first quarter of FY 2007. These reserves were nowhere near sufficient. By late 2006, Lee's fraudulently inflated profits were turning into substantial losses, none of which were reflected in BMO's books and records until after the fraud was discovered.

30.     In September 2006, Market Risk expanded its efforts to obtain independent verification of Lee's marks. As a result, Optionable began using a grid to provide Market Risk with quotes for approximately 100 to 150 out-of-the-money positions in Lee's book, still a significant minority of the total. Each month, Market Risk emailed this grid to an Optionable employee and asked for market quotes for each listed position. The accompanying email stated that it was "understood that the quotes will be verifiable from IM [instant message] sheets on

your archive, and can be made available to us on request." Cassidy devised a procedure for fraudulently completing the grid.

31.     Upon receipt from BMO, the grid was forwarded to Cassidy, who emailed it to Lee at BMO. Lee then emailed the grid, along with his own pricing model, to his personal email address. At home, Lee priced out the grid to his advantage and to conceal the trading losses he was incurring. From the beginning, Lee inflated a portion of the quotes on the grid, and by early 2007 he was deliberately mismarking a majority of those quotes. He then sent those quotes to Cassidy, and Cassidy had an Optionable employee send back to Market Risk a grid containing Lee's quotes.

32.     Cassidy also made specific misrepresentations to BMO when, in the last months of the fraud, Market Risk began asking more questions about the information that BMO was receiving from Optionable. One month, Cassidy gave BMO instant messages that contained quotes that Cassidy had recited to, rather than obtained from, a trader at another firm. Another month, when asked by BMO to confirm that Optionable was not using BMO data when providing quotes, Cassidy falsely replied to BMO in an email that "we go to several different market makers" for the quotes. Cassidy never disclosed to BMO that Lee was, in fact, the exclusive source for all of Optionable's quotes, and Cassidy evaded Market Risk's complaint that many of the grid values BMO obtained from Optionable were significantly higher than the Totem values.

33.     Finally, in late March 2007, Market Risk expressly demanded "ALL" the data supporting Optionable's quotes. Optionable did not supply the supporting data. As described below, the fraud came to an end shortly thereafter.

**Discovery Of The Fraud And Its Impact On BMO**

34.    In February 2007, BMO retained a major accounting firm to review, among other things, BMO's price verification process. In mid-April 2007, the accounting firm recommended that BMO should rely exclusively upon multi-contributor services such as Totem to value Lee's and other illiquid trading books. BMO adopted the accounting firm's recommendations and, as a result, determined that applying Totem's valuations to Lee's book, combined with losses already realized during the quarter due to recent adverse changes in market conditions, required BMO to record losses totaling approximately $350-450 million (CAD) in revenue. Applying the Totem valuations showed that Lee's overvaluation of his book was systemic. For example, Lee's -- and thus Optionable's -- marks were higher than Totem's values in 55 out of 57 positions that were initially examined as part of BMO's internal review. The downward adjustments necessitated by applying the Totem valuations to Lee's book totaled approximately $220 million.

35.    On April 27, 2007, BMO issued a press release announcing $350-450 million (CAD) in "losses" in its commodities trading portfolio, which it attributed to unfavorable market conditions and a purported "refinement" in valuation methodology. On May 8, 2007, BMO announced that Lee and Lee's supervisor had been placed on unpaid leave and that BMO had suspended its business relationship with Optionable. Lee resigned and Lee's supervisor was terminated soon after the announcement.

36.    BMO then further analyzed Lee's book and concluded that in addition to Lee's intentional mismarking of out-of-the-money mark-to-model positions, Lee had also overvalued certain so-called "straddle" positions. To combat his mounting losses and sustain his large bonus, Lee engaged in a series of large straddle transactions known as "exchange of options for options," or "EOOs," beginning in late 2006. In these transactions, which involved hundreds of

15

millions of dollars, Lee bought American-style options, which can be exercised at any time prior to expiration and are traded on the NYMEX, and sold European-style options, which can only be exercised on the expiration date and are traded over the counter.  BMO determined that Lee's EOO positions were overvalued because Lee marked his long American position using a pricing model rather than available NYMEX settlement prices.  Although generally accepted accounting principles ("GAAP") required use of the NYMEX settlement prices, Lee's approach resulted in more favorable values than the NYMEX prices.  In fact, when Lee's EOO profits were high, Lee reduced his deliberate inflation of his other marks to bring them closer to Totem's values.  When the EOO profits were not available to provide a cushion, Lee resumed tampering with his pricing model to inflate the rest of his marks.

37.   As a result of the foregoing, BMO announced a revised total of $680 million (CAD) in reduced revenue on May 17, 2007, which resulted in a $327 million (CAD) reduction in net income for the six months ended April 30, 2007.  This total included a $171 million (CAD) reduction in revenue and a $90 million (CAD) reduction in net income for the quarter ended April 30, 2007, the results for which had not yet been reported.  On May 29, 2007, BMO restated its financial results for the quarter ended January 31, 2007, reducing its previously reported net income by $237 million (CAD) due to the overvaluation of Lee's book.  Although BMO still reported a net profit in that quarter, the restatement adjustments required BMO to record a net loss of $18 million (CAD) for the segment that employed Lee.

**The Deception Of Optionable Shareholders**

38.   In addition to scheming with Lee to overvalue BMO's commodity derivatives portfolio, Cassidy and O'Connor also made materially false and misleading statements about Optionable's business to Optionable's investors and outside auditors.

39.     Cassidy and O'Connor both signed Optionable's Form 10-KSB for the company's

fiscal year ended December 31, 2006, which falsely touted the independent derivatives valuation

services that Optionable supposedly provided to BMO, as follows:

> We also complement our fee-based services with derivatives
> valuation and mark to market services called OPEX Analytics. At
> the request of several of our existing clients, and based on our
> experience and knowledge of the markets as well as wide network
> of counterparties, we can periodically assist our clients in valuing
> their positions in the natural gas derivatives market. We believe
> that the demand for this service from market participants will
> increase possibly creating new revenue opportunities from 1)
> subscription fees as well as 2) additional brokerage fees related to
> price discoveries resulting from the mark to market services.

Optionable's Form 10-KSB for its fiscal year ended December 31, 2005, which Cassidy and

O'Connor also signed, contained a substantially identical passage. These statements were false

and misleading because, among other things, BMO was the principal client for whom those

"valuation services" were performed, and Optionable was secretly defrauding BMO, its largest

brokerage client, rather than "assisting" BMO in "valuing" BMO's positions. Indeed,

Optionable did not perform any "valuation" services at all for BMO.

40.     Statements made in Optionable's quarterly reports during this period, also signed

by Cassidy and O'Connor, were materially false and misleading for the same reason. Like the

two annual reports, Optionable's quarterly reports contained a financial statement footnote

disclosing that a single customer, namely BMO, accounted for a large portion of Optionable's

revenues. According to Optionable's periodic reports, the percentage rose from 18% for 2005, to

24% for 2006, to 30% for the first quarter of 2007. These reports did not disclose, however, that

Optionable's receipt of business from BMO was dependent on Optionable conspiring with Lee to

defraud BMO.

41.     In fact, the percentages cited in Optionable's periodic reports understated the extent of Optionable's financial dependence on BMO. As Optionable acknowledged in its annual reports, Optionable received brokerage commissions from both parties to a trade. Thus, losing BMO's business could also result in losing an equal amount of brokerage commissions from BMO's counterparties. In other words, if BMO itself directly paid for 24% of Optionable's commission revenue, then BMO's trading actually accounted for as much as 48% of the revenue. Another significant source of revenue for Optionable was incentive payments from NYMEX for directing trades to that exchange, a large portion of which were BMO trades.

42.     Cassidy also made material misrepresentations to Optionable's audit firm in management representation letters for the 2005 and 2006 audits. In those letters, Cassidy falsely certified that he had no knowledge of any management fraud affecting Optionable. Both Cassidy and O'Connor also made misrepresentations of a similar nature to Optionable's audit firm when they were interviewed by members of the audit team in conjunction with the 2006 audit.

43.     Cassidy and O'Connor also defrauded NYMEX in a $28.9 million sale of Optionable stock. On April 10, 2007, Cassidy, O'Connor and Optionable's chairman sold a combined 19% stake in Optionable to NYMEX, and Optionable sold to NYMEX a warrant to purchase an additional 21% stake. Specifically, Pierpont Capital, Inc., an entity controlled by Cassidy, sold 1,905,000 Optionable shares to NYMEX for $5,124,450, and Ridgecrest Capital Inc., an entity controlled by O'Connor, sold 1,853,886 Optionable shares to NYMEX for $4,986,953. Neither Cassidy nor O'Connor disclosed to NYMEX the existence of Optionable's scheme with Lee and its potential impact on Optionable's business. In fact, both Cassidy and O'Connor falsely represented in the Stock Warrant Purchase Agreement with NYMEX, which

they both signed, that Optionable's SEC filings were materially accurate and that Optionable had complied in all material respects with the Sarbanes-Oxley Act of 2002.

44.    As the fraud unraveled, Optionable's stock price and business operations were devastated. Optionable's stock dropped from $7 to $5.50 per share following BMO's April 27, 2007 announcement of $350-450 million (CAD) in commodity trading "losses" and a purported "refinement" in BMO's valuation methodology. On May 9, 2007, one day after BMO announced that it had placed Lee and Lee's supervisor on unpaid leave and suspended its business relationship with Optionable, Optionable issued its own announcement referencing, among other things, BMO's disclosure and stating that the suspension would have an adverse effect on Optionable's business. Optionable's stock price fell almost 40% that day, from $4.64 to $2.81 per share. Optionable's stock price dropped another 70%, to $0.85 per share, on May 10, 2008, for a total decline of 82% over the two days following BMO's suspension of its business relationship with Optionable.

45.    Additional adverse disclosures ensued and Optionable's stock price plummeted even further. On May 14, 2007, Optionable announced that Cassidy had resigned from the company. On that same day, NYMEX announced that "to avoid potential conflicts of interest," it was withdrawing the person whom it had appointed to Optionable's board of directors. On May 15, 2007, press reports attributed the NYMEX announcement to Cassidy's prior criminal record, which had not previously been disclosed to public investors or NYMEX and includes a 1993 federal tax evasion conviction and a 1997 federal credit card fraud and money laundering conviction. Optionable's stock price fell below 50 cents per share that day. In all, Optionable stock lost over 90% of its market value from late April to mid-May of 2007, and the stock price has not recovered.

46.     Optionable's business operations have been virtually nonexistent since the Defendants' fraud was uncovered.  Optionable reported virtually no commission revenue for the second half of 2007 and the first half of 2008, compared to $9 million for 2006 and another $9 million for the first half of 2007.

### THE DEFENDANTS' GAINS FROM THE FRAUD

47.     All the Defendants profited from their fraud.  Lee received extravagant bonuses from BMO that were based upon the performance of the trading portfolio whose value was inflated by Lee and the other Defendants' fraudulent scheme.  Connor received large bonuses from Optionable while participating in the fraud at the behest of two of the company's senior officers, Cassidy and O'Connor.  In addition to their other misconduct, Cassidy and O'Connor lined their own pockets by defrauding NYMEX out of approximately $10 million in their April 2007 sale of millions of shares of Optionable stock.

### FIRST CLAIM FOR RELIEF

**Violations of Section 10(b)**
**of the Exchange Act and Rule 10b-5**

(All Defendants)

48.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 47.

49.     Lee, Cassidy, O'Connor and Connor, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, have:  (a) employed devices, schemes and artifices to defraud;  (b) made untrue statements of material fact, or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading;

and/or (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

50.    As part and in furtherance of the fraudulent scheme to inflate the value of BMO's portfolio of natural gas options and circumvent BMO's internal financial controls, Lee, Cassidy, O'Connor and Connor, directly or indirectly, singly or in concert, knowingly or recklessly, engaged in and employed the fraudulent and deceptive devices, schemes, artifices, contrivances, acts, transactions, practices and courses of business and/or made the misrepresentations and/or omitted to state the facts alleged above in paragraphs 1-4 and 16-47.

51.    During the time of the Defendants' fraudulent conduct, BMO furnished periodic reports to the Commission.  Due to the fraudulent practices in which the Defendants engaged, these documents contained materially false and misleading statements, and omitted to state material facts, concerning BMO's financial performance and internal controls, including financial statements that overstated, among other things, BMO's revenue and net income for the subject reporting periods.  As a result, the periodic reports issued by BMO during the time of the Defendants' fraudulent conduct were materially false and misleading, and BMO therefore violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

52.    The Defendants knew or were reckless in not knowing that because of their fraudulent conduct, the periodic reports described above were materially false and misleading, and the Defendants also acted with the requisite scienter by knowingly or recklessly engaging in the fraudulent scheme described above.

53.    By reason of the foregoing, Lee, Cassidy, O'Connor and Connor, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section

10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

54.     Lee, Cassidy, O'Connor and Connor had actual knowledge of BMO's and their own primary violations of Section 10(b) of the Exchange Act [17 C.F.R. § 240.10b-5] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and substantially assisted the primary violations by knowingly engaging in conduct that was a substantial causal factor of such primary violations. By reason of the foregoing and pursuant to Section 20(e) of the Exchange Act, Lee, Cassidy, O'Connor and Connor, singly or in concert, directly or indirectly, also each aided and abetted BMO's and each other's primary violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and unless enjoined will again aid and abet violations of, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5

(Cassidy and O'Connor)

55.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 54 above.

56.     Cassidy and O'Connor, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce, or by the use of the mails, or of the facilities of a national securities exchange, in the offer or sale and in connection with the purchase or sale of securities, knowingly or recklessly, have: (a) employed devices, schemes and artifices to defraud; (b) obtained money or property by means of, or otherwise made, untrue statements of material fact,

or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, transactions, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

57.     As part and in furtherance of the fraudulent scheme to inflate the value of BMO's portfolio of natural gas options and circumvent BMO's internal financial controls, Cassidy and O'Connor, directly or indirectly, singly or in concert, knowingly or recklessly, concealed Optionable's role in the scheme from Optionable's shareholders and the investing public while touting to Optionable's shareholders and the investing public the purported nature, extent and benefits of natural gas derivatives valuation services that Optionable supposedly provided to clients like BMO. In so doing, Cassidy and O'Connor, directly or indirectly, singly or in concert, knowingly or recklessly, engaged in and employed the deceptive devices, schemes, artifices, contrivances, acts, transactions, practices and courses of business and/or made the misrepresentations and/or omitted to state the facts alleged above in paragraphs 1-4 and 16-47.

58.     During the time of the Defendants' fraudulent conduct, Optionable filed periodic reports with the Commission that were signed by both Cassidy and O'Connor. Due to the fraudulent practices in which the Defendants engaged, these documents contained materially false and misleading statements, and omitted to state material facts, concerning Optionable's business activities and financial performance, including the purported derivatives valuation service that Optionable supposedly provided to clients like BMO and Optionable's financial dependence on BMO. As a result, the periodic reports filed by Optionable during the time of the Defendants' fraudulent conduct were materially false and misleading, and Optionable therefore

violated Section 10(b) of the Exchange Act [17 C.F.R. § 240.10b-5] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

59.     Cassidy and O'Connor knew or were reckless in not knowing that the periodic reports described above were materially false and misleading, and they also acted with the requisite scienter by knowingly or recklessly engaging in the fraudulent scheme described above.

60.     In addition, in the offer and sale of Optionable stock to NYMEX, Cassidy and O'Connor, directly or indirectly, singly or in concert, knowingly or recklessly, made materially false and misleading statements to NYMEX and omitted to disclose material facts to NYMEX.

61.     By reason of the foregoing, Cassidy and O'Connor, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

62.     Cassidy and O'Connor had actual knowledge of Optionable's and their own primary violations of Section 10(b) of the Exchange Act [17 C.F.R. § 240.10b-5] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and substantially assisted the primary violations by knowingly engaging in conduct that was a substantial causal factor of such primary violations. By reason of the foregoing and pursuant to Section 20(e) of the Exchange Act, Cassidy and O'Connor, singly or in concert, directly or indirectly, also aided and abetted Optionable's and each other's primary violations of Section 10(b) of the Exchange Act [17 C.F.R. § 240.10b-5] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and unless enjoined will again aid and abet violations, of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

### Violations of Section 13(a) of the
### Exchange Act and Rules 12b-20, 13a-1 and 13a-16

(All Defendants)

63.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 62.

64.     BMO failed to furnish to the Commission, in accordance with the rules and regulations prescribed by the Commission, such annual and other periodic reports as the Commission has prescribed and BMO failed to include, in addition to the information expressly required to be stated in such reports, such further material information as was necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading, in violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-16 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-16].

65.     As alleged above, BMO's annual and other periodic reports during the time of the Defendants' fraudulent conduct were materially false and misleading because they contained materially false and misleading statements, and omitted material information, concerning BMO's financial performance and internal controls, including financial statements that overstated, among other things, BMO's revenue and net income for the subject reporting periods.

66.     As alleged above, Lee, Cassidy, O'Connor and Connor, knowingly or recklessly, directly or indirectly, singly or in concert, engaged in fraudulent practices resulting in:  (a) material overstatements of, among other things, net income on BMO's books and records and in financial statements included in the periodic reports identified above; and (b) other materially false and misleading statements in those periodic reports.

67.     Lee, Cassidy, O'Connor and Connor had actual knowledge of BMO's primary violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-16 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-16], and substantially assisted the primary violations by knowingly engaging in conduct that was a substantial causal factor of such primary violations.  By reason of the foregoing and pursuant to Section 20(e) of the Exchange Act, Lee, Cassidy, O'Connor and Connor aided and abetted BMO's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-16 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-16], and unless enjoined, will again aid and abet violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-16 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-16].

## FOURTH CLAIM FOR RELIEF

### Violations of Section 13(a) of the
### Exchange Act and Rules 12b-20, 13a-1 and 13a-13

(Cassidy, O'Connor and Connor)

68.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 67.

69.     Optionable failed to file with the Commission, in accordance with the rules and regulations prescribed by the Commission, such annual and quarterly reports as the Commission has prescribed and Optionable failed to include, in addition to the information expressly required to be stated in such reports, such further material information as was necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading, in violation of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

70.     As alleged above, Optionable's annual and quarterly reports during the time of the Defendants' fraudulent conduct were materially false and misleading because they contained materially false and misleading statements, and omitted material information, concerning Optionable's business activities and financial performance, including the purported derivatives valuation service that Optionable supposedly provided to clients like BMO and Optionable's financial dependence on BMO.

71.     As alleged above, Cassidy, O'Connor and Connor, knowingly or recklessly, directly or indirectly, singly or in concert, engaged in fraudulent practices that were concealed from the investing public and resulted in:  (a) materially false and misleading statements in the annual and quarterly reports identified above concerning the purported derivatives valuation service that Optionable supposedly provided to clients like BMO and Optionable's financial dependence on BMO; and (b) other materially false and misleading statements in the annual and quarterly reports signed by Cassidy and O'Connor.

72.     Cassidy, O'Connor and Connor had actual knowledge of Optionable's primary violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13] and substantially assisted the primary violations by knowingly engaging in conduct that was a substantial causal factor of such primary violations.  By reason of the foregoing and pursuant to Section 20(e) of the Exchange Act, Cassidy, O'Connor and Connor aided and abetted Optionable's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13], and unless enjoined, will again aid and abet violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13].

## <u>FIFTH CLAIM FOR RELIEF</u>

### Violations of Section 13(b)(2)
### of the Exchange Act

(All Defendants)

73.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 72.

74.     BMO failed to:

    a.     make and keep books, records, and accounts, which, in reasonable

        detail, accurately and fairly reflected the transactions and

        dispositions of its assets; and

    b.     devise and maintain a system of internal accounting controls sufficient to

        provide reasonable assurances that:

        i.     transactions were executed in accordance with

            management's general or specific authorization;

        ii.     transactions were recorded as necessary to permit

            preparation of financial statements in conformity with

            generally accepted accounting principles or any other

            criteria applicable to such statements, and to maintain

            accountability for assets;

        iii.     access to assets was permitted only in accordance with

            management's general or specific authorization; and

        iv.     the recorded accountability for assets was compared with

            the existing assets at reasonable intervals and appropriate

            action was taken with respect to any differences;

in violation of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C §§ 78m(b)(2)(A) and 78m(b)(2) (B)].  As alleged above, BMO made numerous false revenue, net income and other accounting entries on its books and records reflecting the overvaluation of positions in its commodity derivatives trading portfolio; and BMO lacked internal accounting controls sufficient to reasonably assure that its annual and quarterly financial statements were prepared in conformity with GAAP and to prevent traders from deliberately overvaluing their positions and creating the false appearance that those values had been independently verified through market data.

75.     As alleged above, Lee, Cassidy, O'Connor and Connor, knowingly or recklessly, directly or indirectly, singly or in concert, engaged in a fraudulent scheme to inflate the value of BMO's trading portfolio of natural gas options and circumvent BMO's internal controls, which resulted in a failure to accurately and fairly reflect the value of BMO's commodity derivatives trading portfolio in its books and records and material misstatements of BMO's net income and other items on its books and records and in financial statements included in the periodic reports described above.

76.     Lee, Cassidy, O'Connor and Connor had actual knowledge of BMO's primary violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C § 78m(b)(B)] and substantially assisted the primary violations by knowingly engaging in conduct that was a substantial causal factor of such primary violations . By reason of the foregoing and pursuant to Section 20(e) of the Exchange Act, Lee, Cassidy, O'Connor and Connor aided and abetted BMO's violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C § 78m(b)(2)] and unless enjoined will again aid and abet violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C § 78m(b)(2)(A)].

29

77.     Lee also had actual knowledge of BMO's primary violations of Section

13(b)(2)(B) of the Exchange Act [15 U.S.C § 78m(b)(B)] and substantially assisted the primary

violations by knowingly engaging in conduct that was a substantial causal factor of such primary

violations . By reason of the foregoing and pursuant to Section 20(e) of the Exchange Act, Lee

aided and abetted BMO's violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C §

78m(b)(B)], and unless enjoined will again aid and abet violations of Section 13(b)(2)(B) of the

Exchange Act [15 U.S.C § 78m(b)(2)(B)].

### SIXTH CLAIM FOR RELIEF

#### Violations of Section 13(b)(2)
#### of the Exchange Act

(Cassidy, O'Connor and Connor)

78.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 77.

79.     Optionable failed to:

a.     make and keep books, records, and accounts, which, in reasonable

detail, accurately and fairly reflected the transactions and

dispositions of its assets; and

b.     devise and maintain a system of internal accounting controls sufficient to

provide reasonable assurances that:

i.     transactions were executed in accordance with

management's general or specific authorization;

ii.     transactions were recorded as necessary to permit

preparation of financial statements in conformity with

generally accepted accounting principles or any other

criteria applicable to such statements, and to maintain

accountability for assets;

iii.     access to assets was permitted only in accordance with

management's general or specific authorization; and

iv.     the recorded accountability for assets was compared with

the existing assets at reasonable intervals and appropriate

action was taken with respect to any differences;

in violation of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C §§

78m(b)(2)(A) and 78m(b)(2)(B)].  As alleged above, Optionable's books and records included

numerous falsified valuation documents that purported to reflect the results of independent

valuations that Optionable had purported to perform but, in fact, had not performed at all; and

Optionable lacked internal accounting controls sufficient to reasonably assure that the results of

Optionable's purported valuation services were not falsified and that Optionable kept accurate

records of its business activities.

80.     As alleged above, Cassidy, O'Connor and Connor, knowingly or recklessly,

directly or indirectly, singly or in concert, engaged in a fraudulent scheme that resulted in the

fabrication and dissemination of numerous valuation documents which purported to reflect the

results of independent valuations by Optionable that Optionable had not, in fact, performed and

which were maintained in Optionable's books and records.

81.     Cassidy, O'Connor and Connor had actual knowledge of Optionable's primary

violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C §§

78m(b)(2)(A) and 78m(b)(2)(B)] and substantially assisted the primary violations by knowingly

engaging in conduct that was a substantial causal factor of such primary violations.  By reason of

the foregoing and pursuant to Section 20(e) of the Exchange Act, Cassidy, O'Connor and Connor

aided and abetted Optionable's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the

Exchange Act [15 U.S.C §§ 78m(b)(2)(A) and 78m(b)(2)(B)], and unless enjoined, will again aid

and abet violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [§§

78m(b)(2)(A) and 78m(b)(2)(B)].

## SEVENTH CLAIM FOR RELIEF

### Violations of Section 13(b)(5) of
### the Exchange Act and Rule 13b2-1

#### (All Defendants)

82.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 81.

83.    Lee, Cassidy, O'Connor and Connor engaged in fraudulent practices in the course

of which they knowingly circumvented a system of internal accounting controls and knowingly

falsified, directly or indirectly, or caused to be falsified books, records and accounts of BMO that

were subject to Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].  As

alleged above, Lee, Cassidy, O'Connor and Connor knowingly falsified and/or caused others to

falsify valuation records and other documents that BMO used in its financial reporting.  Each of

the Defendants also knowingly circumvented the process by which BMO sought to verify the

recorded value of positions in its commodity derivatives trading portfolio and thereby created the

false appearance in BMO's records that those values had been independently verified through

market data.

84.    By reason of the foregoing, Lee, Cassidy, O'Connor and Connor have violated,

and unless enjoined will again violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. §

78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

## EIGHTH CLAIM FOR RELIEF

### Violations of Section 13(b)(5) of
### the Exchange Act and Rule 13b2-1

(Cassidy, O'Connor and Connor)

85.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 84.

86.    Cassidy, O'Connor and Connor engaged in fraudulent practices in the course of

which they knowingly circumvented or failed to implement a system of internal accounting

controls and knowingly falsified, directly or indirectly, or caused to be falsified books, records

and accounts of Optionable that were subject to Section 13(b)(2)(A) of the Exchange Act [15

U.S.C. § 78m(b)(2)(A)].  As alleged above, Cassidy, O'Connor and Connor knowingly falsified

and/or caused others to falsify Optionable's books and records to create the false appearance that

Optionable had performed independent valuation services for BMO.  Cassidy, O'Connor and

Connor also knowingly failed to implement and/or knowingly circumvented internal controls

designed to prevent the falsification of records reflecting Optionable's valuation services.

87.    By reason of the foregoing, Cassidy, O'Connor and Connor have violated, and

unless enjoined will again violate, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)]

and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

## NINTH CLAIM FOR RELIEF

### Violations of Exchange Act Rule 13b2-2

(Cassidy and O'Connor)

88.    The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 87.

89.     Cassidy and O'Connor, directly or indirectly, made or caused to be made materially false or misleading statements, or omitted to state or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading to an accountant, in connection with: (a) audits and examinations of the financial statements of Optionable; and (b) the preparation and filing by Optionable of reports required to be filed with the Commission.

90.     While acting as directors and officers of Optionable, Cassidy and O'Connor made materially false and misleading statements to accountants in connection with audits of Optionable's annual financial statements during the relevant period.  Cassidy signed materially false and misleading management representation letters that were provided to Optionable's accountants with respect to the audits of Optionable's financial statements for 2005 and 2006, and Cassidy and O'Connor both made materially false and misleading statements to Optionable's accountants when interviewed in connection with the 2006 audit.

91.     By reason of the foregoing, Cassidy and O'Connor have violated, and unless enjoined will again violate, Exchange Act Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

## TENTH CLAIM FOR RELIEF

### Violations of Exchange Act Rule 13a-14

(Cassidy and O'Connor)

92.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 91.

93.     As Optionable's chief executive officer, Cassidy signed certifications pursuant to Rule 13a-14 that were included in Optionable's annual reports on Form 10-KSB for the fiscal years ended December 31, 2005 and December 31, 2006 and in Optionable's interim reports on

Form 10-QSB for the quarters ended September 30, 2005, March 31, June 30 and September 30, 2006, and March 31, 2007. As Optionable's chief executive officer prior to Cassidy, O'Connor signed certifications pursuant to Rule 13a-14 that were included in Optionable's interim reports on Form 10-QSB for the quarters ended March 31, 2005 and June 30, 2005.

94.     In the certifications identified above, Cassidy and O'Connor falsely stated, among other things, that: (a) the reports did not contain any untrue statements of a material fact or omit to state a material fact necessary to make the statement not misleading; and (b) they had disclosed to Optionable's auditors and Optionable's audit committee all significant deficiencies and material weaknesses in the design or operation of Optionable's internal controls and any fraud, whether or not material, that involved management or other employees who had a significant role in Optionable's internal controls.

95.     As alleged above, the annual and quarterly reports filed by Optionable during the time of the Defendants' fraudulent conduct contained materially false and misleading statements concerning Optionable's business as a result of fraudulent practices in which Cassidy and O'Connor participated and significant internal control deficiencies for which Cassidy and O'Connor were responsible. Cassidy and O'Connor failed to disclose their knowledge of, and participation in, the fraudulent scheme to inflate the value of BMO's commodity derivatives trading portfolio or Optionable's significant internal control deficiencies to Optionable's audit committee and auditors.

96.     By reason of the foregoing, Cassidy and O'Connor violated, and unless enjoined will again violate, Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

A.    Permanently enjoining Lee, Cassidy, O'Connor and Connor, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Sections 10(b) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Exchange Act Rules 10b-5 and 13b2-1 [17 C.F.R. §§ 240.10b-5 and 240.13b2-1].

B.    Permanently enjoining Cassidy and O'Connor, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Exchange Act Rules 13a-14 and 13b2-2 [17 C.F.R. §§ 240.13a-14 and 240.13b2-2].

C.    Permanently enjoining Lee, Cassidy, O'Connor and Connor, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from aiding and abetting violations of Sections 13(a) and 13(b)(2) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a) and 78m(b)(2)] and Rules 12b-20, 13a-1 and 13a-16 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1 and 240.13a-16].

D.    Permanently enjoining Cassidy, O'Connor and Connor, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive

actual notice of the injunction by personal service or otherwise, and each of them, from aiding and abetting violations of Exchange Act Rule 13a-13 [17C.F.R. § 240.13a-13].

## II.

Ordering Lee, Cassidy, O'Connor and Connor to each disgorge the ill-gotten gains they received as a result of the violations alleged above, and ordering Lee, Cassidy, O'Connor and Connor to each pay prejudgment interest thereon.

## III.

A.      Ordering Lee and Connor to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

B.      Ordering Cassidy and O'Connor to pay civil money penalties pursuant to 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## IV.

Prohibiting Cassidy and O'Connor, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

**V.**

Granting such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
        November 18, 2008


                                    By:  _____
                                         DAVID ROSENFELD
                                         Associate Regional Director
                                         New York Regional Office
                                         SECURITIES AND EXCHANGE COMMISSION
                                         3 World Financial Center, Suite 400
                                         New York, New York 10281
                                         (212) 336-0153

                                         Attorney for Plaintiff

Of Counsel:

        George N. Stepaniuk
        Scott L. Black
        Joseph P. Dever
        Jess A. Velona
        Brenda Wai Ming Chang