# EXHIBIT C

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**08 CIV 9962**

COMMODITY FUTURES
TRADING COMMISSION,

    Plaintiff,

v.

KEVIN CASSIDY, EDWARD O'CONNOR
OPTIONABLE INC., DAVID LEE and
ROBERT MOORE,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO._____

Complaint for Injunctive and
Other Equitable Relief and
Civil Monetary Penalties
Under the Commodity Exchange
Act.

ECF Case

RECEIVED
NOV 1 8 2008
U.S.D.C.S.D. N.Y.
CASHIERS

      The Commodity Futures Trading Commission ("Commission"), by its

attorneys alleges as follows:

## I.    SUMMARY

      1.    From at least 2003 until approximately May 2007, David Lee ("Lee"), a Bank of

Montreal trader, engaged in acts and practices that constitute violations of the Commodity

Exchange Act, as amended (the "Act"), 7 U.S.C. §§ 1 *et seq.* (2002).  Specifically, Lee

unlawfully mis-marked his natural gas options positions between at least May 2003 and May

2007 ("relevant period") and mis-valued other natural gas options positions from October 2006

until May 2007.  Further, Lee and various brokers deceived the Bank of Montreal by concealing

Lee's mis-marking of the natural gas options.  Such conduct violates Sections 4c(b) of the Act, 7

U.S.C. § 6b(c), and Commission Regulations 33.10 (a), (b) and (c), 17 C.F.R. §§ 33.10(a), (b), &

(c) (2008).

      2.    On April 27, 2007 the Bank of Montreal ("Bank of Montreal" or "BMO")

announced that it anticipated losses associated with its natural gas book somewhere in a range

between C$350,000,000 to C$450,000,000. On that date, the CFTC issued a letter to the Bank of Montreal and its employees informing them to cease any destruction of documents that might be related to the anticipated losses. Lee, a Bank of Montreal trader, received that notice and proceeded to delete various incriminating emails that related to his fraudulent conduct, to-wit, the mis-marking of his natural gas positions, as is more fully alleged below.

3.      Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. §13a-1, the Commission brings this action to enjoin such acts and practices, and compel compliance with the Act. In addition, the Commission seeks civil penalties and such other ancillary relief as the Court deems necessary or appropriate under the circumstances. Unless restrained and enjoined by this Court, there is a reasonable likelihood that Lee and others will continue to engage in the acts and practices alleged in this Complaint or in similar acts and practices, as more fully described below.

## II.    JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which authorizes the Commission to seek injunctive relief against any person, or, to enforce compliance with the Act, whenever it shall appear to the Commission that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation or order there under.

5.      Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), in that the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District.

### III.    THE PARTIES

6.      Plaintiff **Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged with the responsibility for administering and enforcing the provisions of the Act, 7 U.S.C. §§ 1 *et seq.*, and the regulations promulgated there under, 17 C.F.R. §§ 1 *et seq.*  One of its core responsibilities is to protect the public interest by deterring and preventing fraud and disruptions to market integrity.  7 U.S.C. § 5 (2002).

7.      **David Lee** is an individual residing in New Jersey.  Lee was a natural gas trader for the Bank of Montreal from approximately March 2000 until March 2007.  Lee's place of employment while at the Bank of Montreal was 3 Times Square Plaza New York, New York 10036.  Lee is no longer employed by the Bank of Montreal.  While employed at the Bank of Montreal, Lee earned a base salary and was eligible for a bonus based upon the profitability of his trading activities.

8.      Defendant **Robert Moore** ("Moore") is an individual residing in New Canaan, CT.  Moore became the executive managing director for BMO Commodity Derivatives Group in spring 2000.  Moore's place of employment while at the Bank of Montreal was 3 Times Square Plaza New York, New York 10036.  Moore is no longer employed by the Bank of Montreal.

9.      Defendant **Optionable, Inc.** ("Optionable") was incorporated in the state of Delaware on February 4, 2000.  Optionable provided brokerage services in commodity derivatives transactions.  BMO was a client of Optionable.  The company is located at 465 Columbus Avenue, Valhalla, NY 10510.  It was previously located at 555 Pleasantville Road, Suite 10, Briarcliff Manor NY 10510.  Edward O'Connor ("O'Connor") is listed as the registered agent for the service of process.  Kevin Cassidy ("Cassidy") served as Chief Executive Officer ("CEO") from approximately March 2001

3

until March 2004. O'Connor then replaced Cassidy, who became a consultant to the company. In

October 2005, Cassidy again became the CEO, and O'Connor resumed the role of President.

10.     Defendant **Kevin P. Cassidy** is an individual currently residing in Briarcliff

Manor, NY. Cassidy was a "voice broker" for BMO during the relevant period. Cassidy was

Lee's primary voice broker during the relevant period. Cassidy was the CEO of Optionable from

March 2001 until March 2004, and then resumed the role of Optionable's CEO in October 2005.

He resigned that role on May 14, 2007. During the interlude between his two terms as

Optionable's CEO, Optionable offered shares of its stock to the public. Cassidy was charged

with credit card fraud and money laundering in Florida in 1993. *U.S. v. Kevin P. Cassidy*, Case

No. 93-CR-8037. In 1996, he pled guilty to two felony counts and was sentenced to 30 months

in prison. He was released from prison in 1999. Cassidy was also convicted of tax evasion in

New York in 1993 and sentenced to six months in prison, followed by three years probation.

*U.S. v. Kevin P. Cassidy*, Case No. 93-CR-0078. In 1987, Cassidy was charged with wire fraud

in Massachusetts. *U.S. v. Kevin P. Cassidy*, 87-CR-151. He was sentenced to one year

probation and ordered to pay restitution in 1987. Cassidy's place of employment during the

relevant period was at Optionable's locations in Valhalla and Briar Cliff Manor, New York.

11.     Defendant **Edward J. O'Connor** is an individual currently residing in Briarcliff

Manor, NY. O'Connor served as President and director of Optionable from March 2001 and as

the CEO and Treasurer between March 2004 and October 2005. O'Connor also was an

Optionable voice broker. O'Connor was a voice broker for BMO during the relevant period.

From at least 2006 to 2007, O'Connor performed acts that other Optionable employees,

including Cassidy and Scott Connor, would typically perform for Lee. O'Connor's place of

employment during the relevant period was at Optionable's locations in Valhalla and Briar Cliff Manor, New York.

**IV.   FACTS**

**A.   Background**

12.     The **Bank of Montreal** is the fourth largest bank in Canada.  BMO also maintains offices within the United States, including the state of New York.  Specifically, BMO maintains offices at 3 Times Square Plaza, New York, New York 10036.  During the time period from at least 2000 to 2007, BMO operated its Commodity Derivatives Group from the Times Square location.

13.     Since 2000, and throughout the relevant period, BMO's Commodity Derivatives Group engaged in a variety of derivative transactions, including energy derivative transactions. Initially, the Commodity Derivatives Group primarily focused on the provision of risk mitigation strategies and services to its clients, while it also engaged in a certain level of proprietary trading for the purpose of increasing its revenue.  From approximately the end of 2005 until at least May 2007, the Commodity Derivatives Group significantly increased its proprietary trading in energy derivatives, particularly natural gas derivatives.  Natural gas is a commodity as defined by Section 1a(4) of the Act, 7 U.S.C. § 1a(4) (2002).

14.     A derivative transaction is a financial instrument, traded on or off of an exchange, the price of which is directly dependent upon (i.e., "derived from") the value of one or more underlying securities, equity indices, debt instruments, commodities, other derivative instruments, or any agreed upon pricing index or arrangement.  Derivatives involve the trading of rights or obligations based on the underlying product, but do not directly transfer property. Derivatives include futures, options, swaps, and swaptions (which are options on swaps).  For

5

example, a commodity futures contract is a derivative of a physical contract on an underlying commodity, and an option on a futures contract is a derivative of a futures contract.

15.     As with other derivative instruments, natural gas derivative transactions can occur either on an exchange, formally known as a "designated contract market," or off such an exchange, in what is called the "over the counter market" ("OTC" market). When a contract is an exchange-traded contract, a clearing organization becomes the buyer to each seller of a derivative, and the seller to each buyer for clearing members. In this way, the clearing organization effectively becomes the counterparty to every transaction, and the parties' credit risk is with the clearing organization. When a contract is an OTC contract, the parties to a derivatives transaction are exposed to the risk that the counterparty will default on the transaction. During the relevant period, BMO, through its employees, entered into exchange-traded natural gas option transactions on a board of trade that is also a trading facility, the New York Mercantile Exchange ("NYMEX"). *See* 7 U.S.C. § 1a(33) (2002). Such transactions are subject to Commission Regulation 33.10. 17 C.F.R. § 33.10 (2008).

**B.      Lee's Trading and Valuation of NYMEX Natural Gas Options Contracts**

16.     Lee was first employed by BMO in March 1997. Lee was originally hired to be an analyst for BMO's Commodity Derivatives Group in 1997. Lee served as an analyst until approximately March 2000, when he volunteered to become the natural gas trader for BMO. From March 2000 until approximately April 2007, Lee served as BMO's natural gas trader. Lee's salary and bonus as a trader were based upon the profitability of his trades.

17.     As BMO's natural gas trader, Lee traded, i.e., bought and sold, natural gas contracts, including futures contracts, options contracts, swaps, and swaptions.

18.     Lee entered into natural gas option contracts entered into on the NYMEX, a trading facility, throughout the relevant period.

19.     During the relevant period, the vast majority of natural gas options contracts Lee traded were either American-style or European-style natural gas options contracts, both of which are "exchange-traded and cleared" options on the NYMEX.

20.     Options can either be "call options" or "put options."

21.     A call option is an option contract giving the buyer the right but not the obligation to purchase a commodity or other asset at a given price (the "strike price").

22.     A put option is an option contract that gives the buyer the right but not the obligation to sell a specified quantity of a particular commodity or other interest at a strike price.

23.     Lee traded natural gas options that were both "at-the-money" as well as "out-of-the-money." An option is at-the-money if the strike price of the option is about equal to the market price of the underlying instrument.  The at-the-money strike price is nearest to the previous day's close of the underlying futures contract.  A call option is out-of-the-money if the strike price is greater than the market price of the underlying instrument, while a put option is out-of-the-money if the strike price is less than the market price of the underlying instrument.[1]

24.     By trading in these various contracts, Lee established positions on behalf of BMO.  The entirety of Lee's open positions was known as his "book."  As long as Lee's positions were held open or maintained, that is, as long as the positions he established in various contracts were not off-set by an equal and opposite transaction, BMO was both exposed to various risks and possessed the ability to profit from the change in value of the contracts he had

---

[1] By comparison, a call option is in-the-money if the strike price is less than the market price of the underlying instrument, and a put option is in-the-money if the strike price is greater than the market price of the underlying instrument.

bought or sold on its behalf.  BMO authorized Lee to trade and maintain open positions in natural gas contracts for the purpose of providing risk mitigation strategies for its clients as well as for the purpose of speculating on the price movements of natural gas contracts.

25.   While BMO authorized Lee and other traders to trade commodity derivative contracts for the purpose of generating profits for the corporation, it also imposed limits upon these traders.  First, as a general matter, the BMO Risk Review Committee of the Board of Directors annually approved the bank's overall "market risk appetite."  This appetite is expressed in terms of market value exposure, earnings volatility, and stress test exposure.

26.   Another manner in which BMO imposed limits on its traders was through its use of "letters of authority" that set forth the limits imposed upon each individual trader in terms of authorized products and trading limitations.  For example, in these letters of authority, BMO imposed limits upon the traders based upon value at risk (VaR), stress limits, measures derived from the Black Scholes pricing formula (*i.e.*, delta,[2] gamma,[3] theta,[4] vega[5]), liquidity and concentration limits, loss reporting limits, and authorized products.  Through this process, the BMO's Market Risk Division monitored the traders' compliance with their individual trading limits.  BMO limited the traders in regard to who they could enter into transactions with, based upon the credit risk of these counterparties.

---

[2] "Delta" measures the sensitivity of an option's theoretical value to a change in the price of the underlying asset.

[3] Gamma measures the rate of change in the delta for each one-point increase in the underlying asset. Gamma is larger for the at-the-money options, and gets progressively smaller for both in- and out-of-the-money options.

[4] Theta is a measure of the time decay of an option, i.e., the dollar amount that an option will lose each day due to the passage of time.

[5] Vega measures the sensitivity of the price of an option to changes in volatility.

27.     The letters of authority transmitted to BMO's commodity traders were issued by Moore.  Moore knew that traders were required to abide by the limits contained in the letters of authority.

28.     During the relevant period, one of Lee's responsibilities as a natural gas trader was to assign a value to his open positions on a daily basis.  Lee performed this task by "marking" – or assigning a value to – his open option positions, including both his exchange-traded and OTC options.  To perform this task, Lee used a mathematical model.  This particular method of assigning a value to an open position is known as "marking to model."  In assigning a value to his option positions, Lee personally determined the implied volatilities and forward price curves for the options contracts in which he held an open position.  Lee marked to model both his exchange-traded options as well as his OTC options.  Moore knew Lee performed this function on a daily basis.

**C.     BMO's Verification of Lee's Trading Valuations and Calibration of the Traders' Model**

29.     During the relevant period, BMO possessed certain procedures to verify the value of its traders' positions on a bi-monthly basis, including Lee's.  This was known as the independent price verification ("IPV") process.  The intended goal of this process was to ensure that trader prices used to value BMO's trading books are reasonably in line with market prices quoted by external sources.

30.     The BMO IPV procedures provided alternative means by which traders' valuations were to be verified.  One procedure, which the BMO price verification personnel in the back office followed, involved the use of broker quotes in the IPV process for NYMEX natural gas options as well as OTC options.  Specifically, the BMO price verification personnel received from brokers the brokers' view of bids and offers currently available in the market for

certain options, and option strips.[6] BMO's written policy provided that the products were to be verified on a bid-offer basis. The BMO procedure identified particular brokerage firms (i.e., Optionable and another brokerage firm) as the approved sources for such quotes. BMO employees responsible for the IPV process believed that the bid/offer quotes they received from the brokers represented the brokers' independent assessment of the bids and offers currently available in the market for certain option strips.

31.     In the event the IPV process resulted in the conclusion that the traders' valuations of the selected options and option strips differed from the brokers' valuations of the same options and option strips, and the difference exceeded a tolerance threshold, then a valuation adjustment should have been entered in accordance with applicable BMO's accounting standards.

32.     A "tolerance threshold" represents the amount that the trader's valuation and the valuation resulting from the IPV process can differ while still considering the trader's valuation to be valid. For example, if a trader values his book at $98,000,000 but the IPV process determines that the book should be valued at $80,000,000, and the bank employs a tolerance threshold of $10,000,000, then an $8,000,000 valuation adjustment should be taken. In other words, the broker's estimation of what his book is valued at would be reduced by $8,000,000 in this example. In this way, the IPV process can diminish a trader's estimated profits, and thereby reduce his salary and bonus.

33.     One of the brokerage sources used in BMO's IPV process for both exchange-traded natural gas options and OTC natural gas options, i.e. Optionable, was by far BMO's

---

[6] A "bid" is a price quote at which a market participant is willing to buy a contract. An "offer" (sometimes also called an "ask") is a price quote at which a market participant is willing to sell a contract. This meant that BMO employees collected "bid/offer" (or bid/ask) quotes from independent sources and then used a mid-point in the difference between the bid and offer quotes as the price by which they would value the positions. The difference between the bid and offer is known as the "spread".

primary broker for such products. This meant that the trade flow resulting from BMO's natural gas trading activities contributed a significant amount to Optionable's revenue.

34.     In addition to the IPV process, during the relevant period, BMO possessed certain procedures to calibrate the options pricing model its traders' employed in valuing their option positions. This was known as the "volatility skew verification" process, or the "VSV process." In order to verify the skews utilized in the traders' options model, BMO's Market Risk Division required BMO traders to collect from brokers price quotes between the brokers and other market participants, memorialized in instant messages. Market Risk specifically sought such quotes for longer tenor out-of-the-money options and for pipeline options. BMO's Market Risk Division specifically requested that such quotes be obtained from market participants other than BMO. BMO employees responsible for the VSV process believed they received bid/offer quotes between brokers and market participants other than BMO traders. The intended goal of this process was to ensure that skews used to value BMO's trading books were reasonably in line with other market participants' skews. BMO traders, including Lee, were required to collect from brokers quotes from market participants other than BMO in instant messages and maintain them in electronic files for use by BMO's Market Risk Division.

**D.     Lee's Mis-Marking and Mis-Valuation of BMO Natural Gas Contracts**

35.     During the relevant period, Lee knowingly mis-marked his exchange-traded natural gas options, his pipeline options, and his natural gas swaptions. Specifically, Lee knowingly input inaccurate implied volatility values into his options pricing model for various maturity dates and strike prices within those maturity dates. The effect of Lee's mis-marking was to overestimate the value his open natural gas options, pipeline options and swaptions. Lee inflated the value of his book so that it would appear to BMO that his trading was more

profitable than it was in reality. As a result of Lee's mis-marking, the BMO natural gas book

was unlawfully inflated by approximately C$221,875,297 as of January 31, 2007 and

C$257,801,706 as of March 30, 2007. On April 27, 2007, BMO announced that it anticipated

that it would lose somewhere between C$350,000,000 and C$450,000,000. These anticipated

losses were due largely to Lee's mis-marking.

36.    While Lee's unlawful mis-marking scheme was ongoing, he entered into

additional natural gas options positions. When he entered these additional natural gas option

positions, he knew he would also mis-mark such trades. Further, Lee did, in fact, mis-mark these

additional natural gas options positions.

37.    In addition to mis-marking his natural gas options, pipeline options and

swaptions, Lee also mis-valued a significant amount of his natural gas options. Specifically,

starting in October 2006 and ending in early March 2007, Lee started executing a paired options

trade. These trades were actually comprised of four constituent parts – or "legs." Two legs of

Lee's paired options trades consisted of the purchase of American-style natural gas options (both

a call and a put) and the other two legs involved the sale of European-style options (both a call

and a put). All four options shared the same strike price, thereby making the trade equivalent to

a long American-style straddle and a short European–style straddle. The European side of the

transaction did not perfectly off-set the American side because holders of American options can

exercise their options at any point after the strike price has been reached prior to expiration,

whereas holders of European options may only exercise their options (provide the strike price

has been met) upon expiration. This distinction between the two types of options makes the

American options differ in value from the European options. The distinction also means that as

the underlying prices, volatilities and interest rates change, the position comprised by the four legs will also change.

38.     Lee executed an enormous number of such paired options trades and entered them onto the NYMEX.  Lee favored these trades in large part because every time he executed a series of these transactions he was able to attribute a significant profit to them on the initial date of entry.  This initial day's profit did not result from a favorable market move nor did it result from Lee's assignment of improper implied volatilities in his options pricing model, as he did with his other option positions.  Rather, the options pricing model used by Lee simply overvalued these particular positions.  Lee knew that the model over-valued these positions because the price at which he executed these positions ("execution price") was significantly lower than the value assigned to them by the model.  Because Lee knew that there was a risk that the model was assigning an erroneous value to these positions, he should have taken some action to assign an accurate value to them in his book.  For example, Lee should have created a reserve for, or taken a hold back of, the attributed profit to reflect an accurate value for the transactions.  By failing to take any action that would assign an accurate value to these trades, Lee deceived BMO.

39.     While Lee's unlawful mis-valuation scheme was ongoing, he entered into additional natural gas paired options trades.  When he entered these additional natural gas paired options trades, he knew he would also mis-value such trades.  Further, Lee did, in fact, mis-value these additional natural gas paired option trades.

40.     The market for Lee's paired options trades was also illiquid.

41.     In May 2007, BMO re-valued Lee's American-style options positions using NYMEX settlement prices.  As a result of Lee's mis-valuation during the relevant period, the BMO natural gas book was unlawfully inflated by approximately C$227,881,308.  In light of this

re-valuation, and in conjunction with the earlier identified losses, on May 17, 2007, BMO

publicly announced it had re-estimated the losses associated with its commodity derivatives

business to be approximately C$680,000,000.

42.     By inflating the value of his book through both his mis-marking and mis-

valuation activities, Lee generated a larger bonus for himself, his supervisor (Moore) and also

hid losses he had incurred as a result of his trading.

**E.     The Cover-up: Optionable Brokers and another Particular Brokerage Firm**

43.     During the relevant period, Lee and several brokers knowingly deceived and

defrauded BMO employees who verified the value of Lee's natural gas book.  Specifically,

before BMO employees performed the mid-month or end of month (month-end) IPV process,

Lee created a series of fabricated bid/offer quotes (a pair of prices) for various at-the-money

natural gas option positions that were used by BMO's back office to verify the value of his

natural gas options positions.

44.     After creating these fabricated quotes, Lee transmitted them to brokers who

agreed to both (1) transmit Lee's bid/offer quotes to BMO employees who were responsible for

independently verifying Lee's valuations, i.e., employees involved in the IPV process, and (2)

portray Lee's bid/offer quotes as their own professional view of the current bid/offer spread they

observed in the market ("broker bid/offer quotes").  As discussed above, the BMO employees

responsible for verifying Lee's valuation of his book sought, and believed they received,

brokers' independent views of the current broker bid/offer quotes available in the natural gas

options market.

45.     Lee's purpose in creating the fabricated broker bid/offer quotes was to make it

appear as if independent market information corroborated his daily mark-to-model valuations.

46.     Lee and the various brokers who conspired with him, deceived, defrauded and made false reports in connection with the offer to enter into and the entry into natural gas exchange-traded option transactions because:

(a)     Included within the brokers' offers to Lee to enter into natural gas options was the explicit or implicit promise to deceive, defraud, or fail to disclose to, BMO price verification and Market Risk personnel the nature and the source of the broker bid/offer quotes, i.e., the brokers deceived, defrauded, or failed to disclose material information to, BMO price verification and Market Risk personnel to secure Lee's trade flow;

(b)     The brokers deceived, defrauded, or failed to disclose to, BMO price verification and Market Risk personnel the nature and the source of the broker bid/offer quotes in exchange for Lee's entry into natural gas options transactions, which generated commissions for them and their firms; and

(c)     The brokers' offers to enter into options transactions and Lee's entry into options transactions in connection with the broker bid/offer quotes included options that were entered into on the NYMEX.

47.     The fabricated broker bid/offer quotes made it appear as if independent market information corroborated Lee's daily mark-to-model valuations of his open option positions. Since BMO personnel relied upon the independence of such broker quotes, they used these quotes to verify Lee's valuation of his natural gas book and therefore believed Lee's trading to be profitable. Had BMO personnel known that the broker bid/offer quotes were actually Lee's, as opposed to the brokers' independent assessment of the bid/offer in the market, they would have used different sources to verify Lee's valuation of his natural gas book. As a result, the brokers' fraud, deceit, or false reports enabled Lee to continue to enter into natural gas option transactions for several years and to continue to mis-mark his natural gas book.

48.     Lee commenced the deceptive practice described above with Cassidy starting in approximately 2003. During the relevant period, Cassidy either directly transmitted Lee's fabricated broker bid/offer quotes to BMO back office personnel, or he directed others at Optionable to perform such acts.

15

49.     Cassidy either knew that he was deceiving BMO personnel or was reckless with regard to whether his conduct was deceitful because, as a broker, (a) he understood that bid/offer quotes supplied by brokers to an entity's back office were used for price verification purposes, and (b) that employees responsible for verifying the value of a derivatives book would consider it important if the source for the price quotes was their own trader (whose valuation they were seeking to verify) rather than a broker who provides price quotes based upon his observations of bids and offers available in the market.

50.     As the scheme matured, Lee and Cassidy employed increasingly elaborate devices to mislead BMO.  Specifically, Lee and Cassidy employed a variation of the deceptive scheme described above starting in September 2006 and continuing until at least March 2007. Specifically, Optionable developed a service known as "RealMarks," which was purportedly designed to provide a greater array of independent broker bid/offer quotes to entities that previously received bid/offer quotes for only certain energy options.  In providing BMO with this service, it was determined that the requested bids and offers would be placed in a grid format, organized by the contract type, delta, and strike prices ("grid bid/offer quotes").  The typical practice occurred at month end, and involved a BMO employee providing Lee with an empty grid.  Lee would then email this same empty grid to his home email address.  At home that same night, Lee fabricated bids and offers, filling in the grid.  Once he completed this task, he then emailed the fabricated grid bid/offer quotes to Cassidy.  Cassidy then ensured that the fabricated grid bid/offer quotes would be transmitted to BMO's Market Risk Division.  Cassidy either knew that he was deceiving BMO personnel or was reckless with regard to whether his conduct was deceitful because, as a broker, (a) he understood that bid/offer quotes supplied by brokers to an entity's back office were used for price verification purposes, and (b) that

employees responsible for verifying the value of a derivatives book would consider it important if the source for the bid/offer quotes was their own trader (whose valuation they were seeking to verify) rather than a broker who provides bid/offer quotes based upon his observations of bids and offers available in the market.

51.    Lee and Cassidy deceived, defrauded and made false reports in connection with the offer to enter into and the entry into natural gas exchange-traded options because:

(a)    Cassidy deceived, defrauded, or failed to disclose to, BMO price verification and Market Risk personnel the nature and the source of the grid bid/offer quotes to secure Lee's trade flow;

(b)    Cassidy deceived, defrauded, or failed to disclose to BMO price verification and Market Risk personnel the nature and the source of the grid bid/offer quotes in exchange for Lee's entry into natural gas options transactions, which generated commissions for him and Optionable; and

(c)    Cassidy's offers to enter into options transactions and Lee's entry into options transactions in connection with the grid bid/offer quotes included options that were entered onto the NYMEX.

52.    Lee and Cassidy employed a third type of scheme designed to deceive BMO personnel. As explained above in paragraph 35, BMO utilized a "volatility skew verification" or "VSV" process. The purpose of the VSV process was to verify, or calibrate, the volatility skews incorporated in BMO traders' options pricing models. To perform this process, BMO's Market Risk Division required the traders to collect actual bid/offer quotes made by brokers to *other* market participants and contained on instant messages ("other market participants bid/offer quotes"). BMO's Market Risk Division was supposed to review these instant messages and use them to monitor the skew employed in the options pricing model. To conceal his mis-marking activities, which resulted in an inaccurate and biased skew, Lee fabricated other market participants' bid/offer quotes and transmitted them to Cassidy. Cassidy, in turn, either placed or directed someone else to place, these quotes in various instant messages, making it appear as if

they reflected other market participants bid/offer quotes. Cassidy then either transmitted, or directed someone else to transmit, them back to Lee. Lee in turn provided them to BMO's Market Risk Division.

53.     Cassidy and Lee engaged in this scheme from at least January 2006 to March 2007. Cassidy did not disclose to BMO's back office employees that the other market participants bid/offer quotes were actually sent to him by Lee nor did he disclose that they were not obtained from other market participants. Cassidy either knew that he was deceiving BMO personnel or was reckless with regard to whether his conduct was deceitful because, as a broker, (a) he understood that bid/offer quotes supplied by brokers to an entity's back office were used for verification purposes, and (b) that employees responsible for verifying the value of a derivatives book or skew of the model employed to value the derivatives book would consider it important if the source for the price quotes was their own trader (whose valuation they were seeking to verify) rather than another market participant.

54.     Lee and Cassidy, deceived, defrauded or made false reports in connection with the offer to enter into, the entry into, or the maintenance of natural gas option transactions because:

(a)     Cassidy deceived, defrauded, or failed to disclose to, BMO price verification and Market Risk personnel the nature and the source of the other market participants' bid/offer quotes to secure Lee's trade flow;

(b)     Cassidy deceived, defrauded, or failed to disclose to, BMO price verification and Market Risk personnel the nature and the source of the other market participants' bid/offer quotes in exchange for Lee's entry into natural gas options transactions, which generated commissions for him and Optionable; and

(c)     Cassidy's offers to enter into options transactions and Lee's entry into options transactions in connection with the other market participants' bid/offer quotes included options that were entered onto the NYMEX.

55. Cassidy also failed to disclose Lee's conduct to BMO. Because Cassidy was BMO's broker, he owed a fiduciary duty toward BMO, and was required to disclose all material information to BMO. A reasonable person would find the fact that Lee actually was the source for the "broker bid/offer quotes," the "grid bid/offer quotes," and the "other market participants' bid/offer quotes" that Cassidy sent to BMO's back-office - as opposed to an independent source – to be important information.

56. O'Connor and Lee also deceived BMO in a manner similar to the practices described above in paragraphs 43 through 47. For example, on May 31, 2005 O'Connor engaged in this deceptive scheme by receiving bid/offer quotes on certain natural gas option straddles from Lee and then sent these bid/offer quotes to BMO's back office. O'Connor did not disclose to BMO's back office employees that the bid/offer spreads were actually sent to him by Lee nor did he disclose that they were not obtained from the market. O'Connor either knew that he was deceiving BMO personnel or was reckless with regard to whether his conduct was deceitful because, as a broker, (a) he understood that bid/offer quotes supplied by brokers to an entity's back office were used for price verification purposes, and (b) that employees responsible for verifying the value of a derivatives book would consider it important if the source for the price quotes was their own trader (whose valuation they were seeking to verify) rather than a broker who provides price quotes based upon his observations of bids and offers available in the market.

57. O'Connor also failed to disclose Lee's conduct to BMO. Because O'Connor was BMO's broker, he owed a fiduciary duty toward BMO, and was required to disclose all material information to BMO. A reasonable person would find the fact that Lee actually was the source for the bid/offer quotes that O'Connor and other Optionable employees sent to BMO's back-

19

office - as opposed to a broker's independent assessment of the s bid/offer spread available in the market – to be important information.

58.    From approximately July 2005 through January 2007, on at least a monthly basis, another Optionable employee (Optionable employee 3) and Lee engaged in practices similar to those described above in paragraphs 43 through 47. For example, on March 31, 2006 at 9:51 a.m., Lee (from his BMO email address) transmitted to Optionable employee 3 (at his Optionable email address) fabricated pipeline volatilities. Then, at 4:43 p.m., Lee transmits to Optionable employee 3 fabricated at-the-money bid/offer quotes on certain natural gas option contracts and straddles, along with purported market quotes. Almost ten minutes later, at 4:54 p.m., Optionable employee 3 transmits to BMO's back office Lee's fabricated bid/offer quotes, along with the pipeline volatilities Lee previously transmitted earlier in the day. Optionable employee 3 did not disclose to BMO's back office employees that the bid/offer quotes were actually sent to him by Lee nor did he disclose that they were not obtained from the market. Cassidy knew that Optionable employee 3 assisted Lee in this deceptive scheme. Cassidy directed Optionable employee 3 to assist Lee in this deceptive scheme.

59.    During the period of time that Optionable employee 3 and Lee engaged in this deceptive scheme, Optionable employee 3 reviewed Lee's fabricated bid/offer quotes to make sure that they did not vary greatly from actual market bid/offer quotes. Optionable employee 3 engaged in such a review to help ensure that the deceptive scheme would continue to go undetected by BMO's back office personnel. At times, Optionable employee 3 would review Lee's fabricated bid/offer quotes with Cassidy and/or O'Connor to obtain their opinion on whether the fabricated bid/offer quotes seemed plausible.

60.    Lee and Optionable employee 3 engaged in this deceptive scheme with regard to exchange-traded natural gas options at least on the following dates:

```
11/30/05
12/29/05
1/31/06
3/15/06
3/31/06
5/15/06
5/31/06
6/15/06
6/29/06
7/31/06
8/31/06
9/28/06
```

61.    Optionable employee 3 either knew that he was deceiving BMO personnel or was reckless with regard to whether his conduct was deceitful because, as a broker, (a) he understood that bid/offer quotes supplied by brokers to an entity's back office were used for price verification purposes, and (b) that employees responsible for verifying the value of a derivatives book would consider it important if the source for the price quotes was their own trader (whose valuation they were seeking to verify) rather than a broker who provides price quotes based upon his observations of bids and offers available in the market.

62.    Optionable employee 3 also failed to disclose Lee's conduct to BMO.  Because Optionable employee 3 was BMO's broker, he owed a fiduciary duty toward BMO, and was required to disclose all material information to BMO.  A reasonable person would find the fact that Lee actually was the source for the bid/offer quotes that Optionable employee 3 sent to BMO's back-office - as opposed to a broker's independent assessment of the bid/offer spread available in the market – to be important information.

63.     In addition to Optionable employee 3, other employees at Optionable deceived BMO price verification personnel in a similar fashion in the time period from October 2006 until March 2007.

64.     From at least February 2005 until May 2005, another Optionable employee (Optionable employee 4) engaged in practices similar to those described above in paragraphs 43 through 47.  For example, on April 29, 2005, Lee (from his BMO email address) emailed specific bids and offers relating to natural gas option straddles, as well as pipeline volatilities, to Optionable employee 4 (at the employee's Optionable email address) at approximately 1:59 p.m.  Thereafter, this Optionable employee emailed Lee with the exact same bids, offers, and volatilities at 3:56 p.m. to confirm that these were the bids, offers, and volatilities Lee still wanted Optionable to report to BMO's back office.  After receiving such confirmation, Optionable employee 4 then emailed Lee's fabricated bids, offers, and volatilities at 4:07 p.m. to the BMO's back office.  Optionable employee 4 did not disclose to BMO back office employees that the bid/offer spreads and pipeline volatilities were actually sent to him by Lee nor did he disclose that they were not obtained from the market.  Cassidy directed Optionable employee 4 to assist Lee in this deceptive scheme.

F. .    **The Unraveling of the Schemes**

65.     Starting in September 2006, and despite Moore's strenuous objections, BMO used consensus data from a multi-contributor source to assess the value of Lee's natural gas trading book.  Also starting in September 2006, BMO for the first time acquired from Optionable approximately 150 bid/offer quotes for at-the-money, as well as out-of-the-money, natural gas put and call options to assess the value of Lee's natural gas trading book.  Optionable arranged these quotes in a grid format.  Previously, BMO had only used Optionable bid/offer quotes (as

well as another particular brokerage firm) to verify Lee's valuations of his natural gas book. After employing both data sources, BMO employees observed that a great variance existed between the two valuations.

66.    For example, in September 2006, Lee's valuation of his natural gas options positions differed from a valuation derived from Optionable's grid quotes by $9,763,378. By comparison, Lee's valuation of his natural gas options positions differed from a valuation derived from consensus data obtained from the multi-contributor source by $100,064,933.

67.    In October 2006, Lee's valuation of his natural gas options positions differed from a valuation derived from Optionable's grid quotes by $17,835,028. By comparison, Lee's valuation of his natural gas options positions differed from a valuation derived from consensus data obtained from the multi-contributor source by $91,155,083.

68.    In November 2006, partly due to the large divergence between Optionable's grid quotes and the multi-contributor source consensus data, BMO acquired a second multi-contributor source to assess Lee's valuation of his natural gas options positions. In November 2006, Lee's valuation of his natural gas options positions differed from a valuation derived from Optionable's grid quotes by $20,317,694. By comparison, Lee's valuation of his natural gas options positions differed from a valuation derived from consensus data obtained from the first multi-contributor source by $133,808,893 and the second multi-contributor source by $137,806,710.

69.    In December 2006, Lee's valuation of his natural gas trading book differed from a valuation derived from Optionable's grid quotes by $17,561,005. By comparison, Lee's valuation of his natural gas options trading positions differed from a valuation derived from consensus data obtained from the first multi-contributor source by $140,716,063 and the second

multi-contributor source by $137,157,611. Moore knew about these disparities between Lee's valuations and the multi-contributor source valuations.

70.    In April 2007, BMO completed an analysis of Lee's adjustments to the implied volatility values he employed in his model. That analysis compared Lee's implied volatilities to implied volatilities derived from the multi-contributor source data. In comparing the two sets of at-the-money implied volatilities on various options contracts, BMO employees observed that the two diverged by as much as two (2) full volatilities. Further, for the contracts where the difference between the two sets of implied volatilities was the greatest, they observed that Lee held large positions. In short, they observed that Lee held large exposures where his implied volatilities were significantly greater than the multi-contributor sources' implied volatilities. Specifically, they noted that there was a positive correlation in Lee's exposure to his implied volatilities in 46 out of 56 contracts. In theory, if Lee was not engaged in intentional mis-marking of his options book, the difference between the two sets of implied volatilities should have been independent of how Lee's book was structured. BMO further determined that the odds of such a pattern occurring randomly were approximately 1 in 1.6 million.

71.    Based in part on this evidence, BMO executives concluded that Lee had been intentionally mis-marking his book. As a result, on April 27, 2007, BMO announced that it anticipated losses associated with its natural gas book somewhere in a range between C$380,000,000 and C$450,000,000. On that date, the CFTC issued a letter to BMO employees informing them to cease any destruction of documents that might be related to the anticipated losses. Lee received that notice and proceeded to delete various incriminating emails that related to his deceptive scheme.

**G.     Moore's Supervision of Lee and Relationship with Cassidy**

72.     During the relevant period, Moore was BMO's Commodity Products Group Executive Managing Director.  In that role, Moore was Lee's direct supervisor from approximately April 2000 until April 2007.  Prior to being hired as the Executive Managing Director of BMO's derivatives trading group, Moore had been a trader himself at other organizations.  Moore touted himself as an expert in energy trading.

73.     As part of his duties, Moore was responsible for ensuring that Lee and others complied with BMO's policies and procedures, including the ethics policies.  As Lee's supervisor, Moore created a culture that enabled Lee to defraud BMO.  Moore failed to implement an adequate level of supervision over Lee and failed to act in good faith as Lee's controlling person.

*Moore Engaged in and Permitted Violations of BMO Policies*

74.     Moore knowingly allowed Lee and others to violate critical BMO policies.  For example, Moore violated, and allowed Lee to violate, BMO's ethical policies.  For example, each BMO employee was required to comply with its group's "Professional and Ethical Standards."  During the relevant period, BMO's Commodity Derivatives Group "Professional and Ethical Standards" required employees to adhere to the following directives:

4.1     To conduct the Bank's business in accordance with established market practices.

5.2     Business must not be directed to any counterparty or brokers in order to reciprocate gifts, entertainment or favours.  Any such benefits are to be declared openly.

5.3     No gift or entertainment should be accepted if:

- it would be embarrassing to explain; or
- it is in excess of that which would be considered as being of modest value; or

- the motives of the party providing the gift or entertainment are questionable.

Any offers that contravene these guidelines, or any doubt concerning these matters, should be referred to the Commodity Products Group Executive Managing Director.

5.4    Any attempt by a market participant, broker, or counterparty to obtain favours directly must be reported at once to the Commodity Products Group Executive Managing Director.

75.    Further, during the relevant period, each BMO employee was required to abide by BMO's "Principles, Code of Conduct and Ethics."  BMO's "Principles, Code of Conduct and Ethics" provided the following:

### Dealing With Conflicts of Interest

A conflict of interest is any situation where any of us:

(a) has a personal interest that would be likely to adversely affect, or even appear to adversely affect, our loyalty to, or judgment on behalf of, BMO or a prospective or actual customer or supplier;
(b) has chosen, or may appear to have chosen his/her interests over the interests of BMO, a prospective or actual customer, or a supplier of BMO; or
(c) takes actions or has interests that may make it difficult to perform his/her work at BMO objectively or effectively.

76.    BMO corporate policies and standards addressing actual and potential conflicts of interest required BMO employees, managers, and officers to avoid activities, interests, or associations that might interfere or appear to interfere with the independent exercise of good judgment, or with the best interests of BMO.  Further, BMO corporate standard addressing conflicts of interest explicitly stated that it is not acceptable for any employee, manager, or officer to accept gifts, entertainment or other benefits, where the "entertainment, travel arrangements, meals, refreshments or accommodations [are] unrelated to business discussions or development or which BMO would not reimburse as a reasonable business expense."

26

77.    Disregarding these ethical policies, Moore received gifts, travel, meals and money from Cassidy that were not business related, in excess of that which would be considered as being of modest value, from a source whose motives were highly questionable, and failed to openly declare them.  Moore's willing receipt of such gifts, travel arrangements, meals, and funds made it difficult for him to perform his work at BMO objectively or effectively when it came to Optionable and Cassidy.  Moore disregarded warning signs of Lee's fraud.  Had Moore viewed Optionable and Cassidy at arm's length, he would have discerned that BMO's IPV process could be undermined by a corrupt broker and trader.

78.    The nature, frequency, and value of the gifts, travel arrangements, meals and money Moore received from Cassidy created both the appearance, as well as an actual, conflict of interest.  Notably, Cassidy repeatedly paid for Moore's gambling vacations, some of which were jointly attended by Lee.  During these gambling vacations, Cassidy provided both Lee and Moore with several thousand dollars with which to gamble.  Some of Cassidy's expenditures on Moore are set forth below:

- On March 16, 2004 Cassidy paid $650 to Trading Places Concierge for tickets purchased on behalf of Moore.

- On December 5, 2004 Cassidy paid $190.40 for a room for Moore at the Hilltop Inn, a hotel close to the Foxwoods Resort Casino in Ledyard, Connecticut.  The same day, Cassidy paid $180.40 for dinner at Cedars Steak House, a gourmet restaurant in the Great Cedar Hotel at the Foxwoods Resort Casino.

- On February 5, 2005 Cassidy paid $96.83 for dinner with Moore at the Summer Shack, a seafood restaurant at the Mohegan Sun Resort and Casino in Uncasville, Connecticut.

- On March 7, 2005 Cassidy paid $191.39 for car service for Moore.

- On April 9, 2005 Cassidy paid $258.85 for dinner with Moore at Cedars Steak House.

- On July 28, 2005 Cassidy paid $454.00 to John Allan's, a men's grooming club in Manhattan, which included expenses for Moore and Noah Rothblatt, a floor broker employed by Optionable.

- On October 17, 2005 Cassidy paid $939.00 to John Allan's, which included expenses for Moore and Lee.

- Over the weekend of November 18 and 19, 2005, Cassidy paid $1,218.46 for expenses incurred with Lee and Moore at the Borgata Spa, in the Borgata Hotel Casino & Spa in Atlantic City, New Jersey.

- On April 21, 2006 Cassidy paid $132.42 for dinner with Moore at the Summer Shack.

- On April 22, 2006 Cassidy paid $414.40 for dinner with Moore at the Foxwoods Grand Pequot Tower, a hotel at the Foxwoods Resort Casino.

- On June 1, 2006 Cassidy arranged for transportation for Moore with Quality Executive Limousine, costing $1,054.14.

- On August 17, 2006 Cassidy arranged for transportation for Moore with Quality Executive Limousine, costing $412.09.

- On November 1, 2006 Cassidy paid $374.61 in expenses incurred with Moore at the Grand Pequot Hotel and Cedars Restaurant at the Foxwoods Resort Casino.

- On March 2, 2007 Cassidy paid $785.07 for dinner with Moore at Michael Jordan's Steakhouse in New York.

- On March 3, 2007 Cassidy paid $524.52 for a meal with Moore at the Mohegan Sun Hotel, at the Mohegan Sun Resort and Casino.

79.      The degree to which Moore's interests overrode his loyalty to BMO is also evidenced by the fact that he considered becoming a director of Optionable in at least 2001, yet never disclosed this to BMO.  Moore also sought to invest funds in one of Cassidy's businesses, yet did not disclose this to his BMO superiors either.

80.      Moore knew that Lee and Cassidy shared a relationship similar to the one he shared with Cassidy.  Moore knew that Lee was engaged in activities with Cassidy that created not only the appearance of a conflict of interest, but an actual conflict of interests as well.

81.      By failing to avoid activities, interests, or associations that might interfere or appear to interfere with his independent exercise of good judgment, or with the best interests of

28

BMO, Moore violated BMO ethical policies. By accepting "entertainment, travel arrangements, meals, refreshments or accommodations [unrelated to business discussions" Moore violated BMO ethical policies. Lee knew of Moore's behavior and violations and this knowledge persuaded him and encouraged him to continue his fraudulent conduct with Cassidy and Optionable. By violating BMO ethical policies and by allowing the appearance, as well as engaging in, an actual, conflict of interest with Cassidy and Optionable, Moore failed to implement an adequate level of supervision and failed to act in good faith as Lee's controlling person.

82.     By failing to require Lee to avoid activities, interests, or associations that might interfere or appear to interfere with his independent exercise of good judgment, or with the best interests of BMO, Moore allowed Lee to violate BMO ethical policies. By allowing Lee to accept "entertainment, travel arrangements, meals, refreshments or accommodations "unrelated to business discussions" Moore allowed Lee to violate BMO ethical policies. Lee knew that Moore allowed him to violate BMO's ethical policies and this knowledge persuaded him and encouraged him to continue his fraudulent conduct with Cassidy and Optionable. By allowing Lee to violate BMO ethical policies, Moore failed to implement an adequate level of supervision and failed to act in good faith as Lee's controlling person.

*Moore Turned a Blind Eye to Evidence of Lee's Mis-Marking*

83.     Aside from allowing or committing violations of BMO policies that were put in place to engender a culture of compliance and ethics, Moore disregarded salient facts that, if they had been investigated, could have led to the detection of Lee's fraud earlier.

84.     For example, Moore knew and encouraged Lee to trade his book while on vacation, despite BMO policies strongly recommending against such practice. Moore also knew

about the disparities between Lee's valuation of his options book and the valuations resulting

from multi-contributor sources.  Despite the size of the valuation discrepancies, Moore did not

question Lee about how he arrived at the implied volatility values that were inputted into the

model or the reliability of the skews employed in his model.  Moore also knew that during the

relevant period, several OTC counterparties disputed the value Lee attributed to their OTC

transactions, which were based on Lee's options model.  Moore did not question Lee about the

reason why so many disputes arose and why the discrepancies were so large between him and the

counterparties.  Moore did not perform any meaningful investigation into these and other matters

that, had they been investigated, could have led to the detection of Lee's fraud earlier.  Moore

failed to implement an adequate level of supervision and failed to act in good faith as Lee's

controlling person.

*Moore Permitted Lee to Engage in Conduct That Was Inconsistent with BMO's Best Interests*

85.     In addition to allowing Lee engage in conduct that was in conflict with the duty

he owed to BMO, Moore also knew about Lee's paired options trades and that they generated an

excessive profit on the first day as a result of the way in which the BMO options model valued

these positions.  As an experienced trader and manager, Moore should have required a holdback

on these trades or taken some action on the first day they were executed, so that these positions

were valued closer to the price at which they were executed.  By allowing Lee not to take a

holdback, Moore failed to implement an adequate level of supervision and failed to act in good

faith.

86.     Further, Moore also knew that the market for these paired options trades was

illiquid and, as a result, he should have required a holdback, or reserve, to be taken.  Specifically,

Cassidy acting as Lee's broker, arranged for the vast majority of these trades to be executed

opposite entities owned and/or controlled by a single individual. Moore knew that this individual, or entities he owned or controlled, were the counterparties to the vast majority of these trades. Given that this individual and his entities were virtually the sole counterparty to these trades, Moore knew that the market for these transactions was illiquid. Despite the apparent illiquid market for these positions, Moore allowed Lee to post daily profits associated with these trades without requiring him to take a holdback, or reserve. By not taking any type of reserve or holdback, the Commodity Derivatives Group appeared to be generating larger profits than was warranted under the circumstances. By allowing Lee not to take a holdback, Moore failed to implement an adequate level of supervision and failed to act in good faith as Lee's controlling person.

## V.    VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT I:
### LEE'S VIOLATIONS OF THE ACT

87.    Paragraphs 1 through 86 are realleged and incorporated herein by reference.

88.    Section 4c(b) of the Act, 7 U.S.C. § 4c(b), makes it unlawful for any person to enter into or confirm the execution of any transaction involving any commodity regulated under this Act that is of the character of, or is commonly known to the trade as an option, bid, offer, put or call contrary to any rule, regulation, or order of the Commission, prohibiting such transaction or allowing such transaction under such terms and conditions as the Commission shall prescribe.

89.    Pursuant to Section 4c(b) of the Act, the Commission promulgated Regulation 33.10, 17 C.F.R. § 33.10, which relates to options entered into on a trading facility and provides:

It shall be unlawful for any person directly or indirectly:

(a) To cheat or defraud or attempt to cheat or defraud any other person;

(b) To make or cause to be made to any other person any false report or statement

thereof or cause to be entered for any person any false record thereof;

(c) To deceive or attempt to deceive any other person by any means whatsoever

in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction

90.     Lee violated Section 4c(b) of the Act, and Regulations 33.10(a), (b) and (c) by:

mis-marking exchange-traded natural gas options positions from at least May 2003 until April 2007 and issuing false daily profit and loss reports to BMO;

mis-valuing exchange-traded natural gas options positions from at least October 2006 until April 2007 and issuing false daily profit and loss reports;

fabricating broker bid/offer quotes and transmitting these to brokers for false reports to be transmitted to BMO price verification personnel;

fabricating grid bid/offer quotes and transmitting these to brokers for false reports to be transmitted to BMO price verification personnel;

fabricating other market participants' bid/offer quotes and transmitting these to brokers for false reports to be transmitted to BMO Market Risk personnel; and

receiving stock warrants in exchange for his order flow and failing to disclose to BMO his conduct.

91.     Each and every act of fraud, attempted fraud, deceit, attempted deceit, and the making of or causing to be made, a false report, is alleged herein as a separate and distinct violation of Section 6c(b) of the Act, 7 U.S.C. § 6c(b) (2002), and Commission Regulations 33.10(a), (b), and (c), 17 C.F.R. §§ 33.10(a), (b), & (c) (2008).

## COUNT II:
## CASSIDY'S VIOLATIONS OF THE ACT

92.     Paragraphs 1 through 91 are re-alleged and incorporated herein by reference.

93.     Cassidy violated Section 4c(b) of the Act, and Commission Regulations 33.10(a), (b) and (c) by

receiving fabricated broker bid/offer quotes from Lee and transmitting them in false reports to BMO price verification personnel;

receiving fabricated grid bid/offer quotes and transmitting them in false reports to BMO price verification personnel;

receiving and fabricating other market participants' bid/offer quotes and transmitting them in false reports to BMO Market Risk personnel; and

failing to disclose to BMO Lee's conduct as well his own relating to nature and source of the broker bid/offer quotes, the grid bid/offer quotes, and the other market participants' bid/offer quotes.

94.     Each and every act of fraud, attempted fraud, deceit, attempted deceit, and the making of or causing to be made, a false report, is alleged herein as a separate and distinct violation of Section 6c(b) of the Act, 7 U.S.C. § 6c(b) (2002), and Commission Regulations 33.10(a), (b), and (c), 17 C.F.R. §§ 33.10 (a), (b), & (c) (2008).

## COUNT III:

### O'CONNOR'S VIOLATIONS OF THE ACT

95.     Paragraphs 1 through 91 are re-alleged and incorporated herein by reference.

96.     O'Connor violated Section 4c(b) of the Act, and Commission Regulation 33.10(a), (b) and (c) by:

receiving Lee's broker bid/offer quotes and transmitting them in false reports to BMO price verification personnel; and

failing to disclose to BMO both Lee's conduct as well his own relating to nature and source of the broker bid/offer quotes.

97.     Each and every act of fraud, attempted fraud, deceit, attempted deceit, and the making of or causing to be made, a false report, is alleged herein as a separate and distinct violation of Section 6c(b) of the Act, 7 U.S.C. § 6c(b) (2002), and Commission Regulations 33.10(a), (b), and (c), 17 C.F.R. §§ 33.10 (a), (b), & (c) (2008).

## COUNT IV:
## MOORE'S VIOLATIONS OF THE ACT

98.     Paragraphs 1 through 91 are realleged and incorporated herein by reference.

99.     Section 4c(b) of the Act, 7 U.S.C. § 4c(b), makes it unlawful for any person to enter into or confirm the execution of any transaction involving any commodity regulated under this Act that is of the character of, or is commonly known to the trade as an option, bid, offer, put or call contrary to any rule, regulation, or order of the Commission, prohibiting such transaction or allowing such transaction under such terms and conditions as the Commission shall prescribe.

100.    Pursuant to Section 4c(b) of the Act, the Commission promulgated Regulation 33.10, 17 C.F.R. § 33.10, which relates to options entered into on a trading facility and provides:

> It shall be unlawful for any person directly or indirectly:
>
> (a) To cheat or defraud or attempt to cheat or defraud any other person;
>
> (b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof;
>
> (c) To deceive or attempt to deceive any other person by any means whatsoever
>
> in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

101.    Lee violated Section 4c(b) of the Act, and Regulations 33.10(a), (b) and (c) by:

> mis-marking exchange traded natural gas options from at least May 2003 until April 2007 and issuing false daily profit and loss reports to BMO;
>
> mis-valuing exchange-traded natural gas options from at least October 2006 until April 2007 and issuing false daily profit and loss reports; fabricating broker bid/offer quotes and transmitting these to brokers for false reports to be transmitted to BMO price verification personnel;
>
> fabricating grid bid/offer quotes and transmitting these to brokers for false reports to be transmitted to BMO price verification personnel;
>
> fabricating other market participants' bid/offer quotes and transmitting these to brokers for false reports to be transmitted to BMO Market Risk personnel; and

receiving stock warrants in exchange for his order flow and failing to disclose to BMO his conduct.

102.     Each and every act of fraud, attempted fraud, deceit, attempted deceit, and the making of or causing to be made, a false report, is alleged herein as a separate and distinct violation of Section 6c(b) of the Act, 7 U.S.C. §6c(b) (2002), and Commission Regulations 33.10(a), (b), and (c), 17 C.F.R. §§ 33.10(a), (b), & (c) (2008).

103     Moore is liable for each of Lee's violations of Section 4c(b) of the Act, and Commission Regulation 33.10(a), (b) and (c) as he directly or indirectly controlled Lee and did not act in good faith, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2002).

104     Each and every act of Lee's fraud, attempted fraud, deceit, attempted deceit, and the making of or causing to be made, a false report, is alleged herein as a separate and distinct violation of Section 6c(b) of the Act, 7 U.S.C. § 6c(b) (2002), and Commission Regulations 33.10(a), (b), and (c), 17 C.F.R. §§ 33.10(a), (b), & (c) (2008), and Moore is liable for each of those discrete violations pursuant to Section 13(b) of the Act. 7 U.S.C. § 13c(b) (2002).

## COUNT V:
## OPTIONABLE'S LIABILITY UNDER THE ACT

105.     Paragraphs 1 through 97 are re-alleged and incorporated herein by reference.

106.     Cassidy, O'Connor, Optionable Employee 3, and Optionable Employee 4 violated Section 4c(b) of the Act, and Commission Regulations 33.10(a), (b) and (c) by:

> receiving Lee's broker bid/offer quotes and transmitting them in false reports to BMO price verification personnel; and

> failing to disclose to BMO both Lee's conduct as well his own relating to nature and source of the broker bid/offer quotes.

107.     Each and every act of fraud, attempted fraud, deceit, attempted deceit, and the making of or causing to be made, a false report, is alleged herein as a separate and distinct

violation of Sections 6c(b) of the Act, 7 U.S.C. § 6c(b) (2002), and Commission Regulation 33.10 (a), (b), and (c), 17 C.F.R. §§ 33.10(a), (b), & (c) (2008).

108.    Optionable is liable for each of its officer and employees' violations of Section 4c(b) of the Act, and Commission Regulations 33.10(a), (b) and (c) pursuant to Section 2a(1)(B) of the Act, 7 U.S.C. § 2a(1)(B) (2002).

109.    Each and every act of Cassidy's, O'Connor's, Employee 3's and Employee 4's fraud, attempted fraud, deceit, attempted deceit, and the making of or causing to be made, a false report, is alleged herein as a separate and distinct violation of Section 6c(b) of the Act, 7 U.S.C. § 6c(b) (2002), and Commission Regulations 33.10(a), (b), and (c), 17 C.F.R. §§ 33.10 (a), (b), & (c) (2008), and Optionable is liable for each of those discrete violations pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B) (2002).

## VII.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.    Find Lee liable for violating Section 4c(b) of the Act, and Commission Regulations 33.10(a), (b) and (c);

B.    Find Cassidy liable for violating Section 4c(b) of the Act, and Commission Regulations 33.10(a), (b) and (c);

C.    Find O'Connor liable for violating Section 4c(b) of the Act, and Commission Regulations 33.10(a), (b) and (c);

D.    Hold Moore liable for Lee's violations of Section 4c(b) of the Act, and Commission Regulations 33.10(a), (b) and (c), pursuant to Section 13c(b) of the Act;

E.      Hold Optionable liable for Cassidy's, O'Connor's, and Connor's violations of

Section 4c(b) of the Act, and Commission Regulations 33.10(a), (b) and (c), pursuant to Section

2(a)(1)(B) of the Act;

F.      Enter an order of permanent injunction restraining and enjoining Lee, Cassidy,

O'Connor, Moore, and Optionable, and any of their affiliates, agents, servants, employees,

successors, assigns, attorneys, and persons in active concert with them who receive actual notice

of such order by personal service or otherwise, from directly or indirectly violating Section

6c(b) of the Act, 7 U.S.C. § 13c(b) (2002), and Commission Regulations 33.10(a), (b), and (c),

17 C.F.R. §§ 33.10(a), (b), and (c) (2008);

G.      Enter an order directing Lee, Cassidy, O'Connor, Moore, and Optionable, to pay

civil monetary penalties, to be assessed by the Court, in an amount not to exceed $120,000 or

triple the monetary gain for each violation of the Act, as described herein, during the time period

between October 23, 2000 and October 22, 2004, and $130,000 or triple the monetary gain for

each violation of the Act, as described herein, on or after October 23, 2004; and,

H.      Enter an order providing for such other and further remedial and ancillary relief,

including, but not limited to restitution, disgorgement and damages to all persons affected by

Defendants' actions, as this Court may deem necessary and appropriate; and,

I.      Enter an order requiring Defendants to pay costs and fees as permitted by 28

U.S.C. §§ 1920 and 2412(a)(2).

Dated: November 18, 2008

Respectfully Submitted,

Joseph Rosenberg
Attorney for Plaintiff
Commodity Futures Trading Commission
19th floor
Eastern Region Headquarters
140 Broadway
New York, New York 10005
646-746-9765
646-746-9940 (fax)


Joan Manley
Christine Ryall,
Eugene Smith
Division of Enforcement
ATTORNEYS FOR PLAINTIFF
COMMODITY FUTURES TRADING
COMMISSION
1155 21st Street N.W.
Washington, D.C. 20581
(202) 418-5356
(202) 418-5519 (facsimile)